STATE of Minnesota, Respondent,

v.

Mark Alan RISK, Appellant.

No. C4–98–1896.

Supreme Court of Minnesota.

July 29, 1999.

Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Michael A. Hatch, Atty. Gen., Susan Gaertner, Ramsey County Atty., Jeanne L. Schleh, Asst. Ramsey County Atty., St. Paul, for respondent.

## OPINION

LANCASTER, Justice.

Following a jury trial in Ramsey County District Court, appellant, Mark Alan Risk, was convicted by a Ramsey County jury of first-degree premeditated murder for the stabbing death of Michael L'Heureux. The district court, applying the federal rule adopted in *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), rejected appellant's pretrial motion to suppress the custodial statements he made to police shortly after his arrest, concluding that appellant did not invoke his right to counsel during the custodial interrogations because he did not assert his right to counsel in an unambiguous manner. Pursuant to our decision in *State v. Robinson,* 427 N.W.2d 217 (Minn.1988), we hold that in order to protect an accused's right to counsel under the state constitution, police must stop questioning and must clarify an accused's intentions if the accused makes a statement during custodial interrogation that could reasonably be construed as an expression of a desire to deal with the police only through counsel. Because there are no grounds for suppression of appellant's statements, we affirm appellant's conviction.

### I. Background

Most of the state's evidence against the appellant at trial consisted of testimony and physical evidence that he does not challenge on appeal. In summary, the state's evidence was that appellant's girlfriend had previously been involved in a relationship with L'Heureux; after learning that L'Heureux had brutally assaulted appellant's girlfriend during this prior relationship, appellant had expressed to several individuals his desire to kill L'Heureux in order to get even with him for what he had done to his girlfriend. On Sunday, September 14, 1997, the day of the murder, appellant went to L'Heureux's home and gained entrance to the home by telling L'Heureux that he was interested in the victim's Rottweiler dogs. Once inside the home appellant hit L'Heureux, possibly with a metal pipe, and stabbed him multiple times. The attack began in the house and continued into the street. When police arrived in response to a neighbor's 911 call, they found L'Heureux lying on the ground partially under his car. L'Heureux died at the scene.

Appellant was taken into custody two days after the murder. He was interviewed by St. Paul homicide investigators on three separate occasions – twice on September 19, 1997 (the day of his arrest), and once more the following day.

Appellant's claim of error concerns the district court's admission of police testimony summarizing the three statements appellant made to police while in custody.

*The first interview*

At the beginning of the first interview, appellant was given a *Miranda* warning,[1]

1. *Miranda v. Arizona,* 384 U.S. 436, 468–73, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that an accused be informed prior to interrogation that he or she has a right to remain silent, that anything the accused says can be used in court, that the accused has a

which included a statement that appellant "had a right to talk to a lawyer and have a lawyer with him during any questioning." Appellant initialed and signed a form acknowledging that he had heard and understood the warning. The only time appellant discussed the possibility of requesting counsel during this initial interview was in the following exchange at the interview's outset:

> Sgt. Paskett (RP): And if you cannot afford a lawyer, one will be appointed for you and you may remain silent until you talk to him.
>
> Appellant (MR): Cuz I know I'll just say, "you want a lawyer." Then they don't talk to you no more.

Questioning began concerning an unrelated misdemeanor assault complaint for which appellant had been arrested.[2] Later in the interview, the police changed course by telling appellant that "there's a couple other things, too. People are throwing your name around on another deal out there." The "other deal" was L'Heureux's murder. Appellant admitted during the first interview that he had been to L'Heureux's house on the day of the murder, stating that he stopped by that afternoon to talk to L'Heureux, whom he claimed to have met once 18 years ago, to inquire about purchasing a dog. According to appellant's version of events, he then went to a nearby liquor store and spent the evening at his former girlfriend's home before going to Born's Bar at around 11:30 p.m.

*The second interview*

Investigators questioned appellant a second time that same day, probing further as to appellant's whereabouts on the day of the murder and his possible motive for killing L'Heureux. In the middle of this second interview, appellant was informed that he was under arrest for the murder of L'Heureux.

During the second interview, appellant's version of events changed, and he indicated that he now recalled going to two bars on Old Hudson Road in St. Paul before going to Born's Bar the evening of the murder. Originally stating that he stood at L'Heureux's front door during his entire visit with L'Heureux, appellant now remembered that he may have been inside the home and that he used the bathroom. Later, appellant recalled that he could have been sitting on a couch in the living room.

Denying any knowledge of what L'Heureux had done to his girlfriend, appellant said that he had heard L'Heureux had done "terrible things to women," and went on to say that if he had known that L'Heureux assaulted his girlfriend, "I would have shot him." Although the police officers had made no reference to the fact that L'Heureux had hepatitis, appellant said he would have shot L'Heureux instead of stabbing him because "I wouldn't want to touch him. He's got hepatitis."

Only near the end of the second interview did appellant raise the issue of contacting his counsel. The following excerpts contain the sequences in which appellant discusses his attorney:

> MR: Am I being charged? *Can I call my lawyer?* I do have a lawyer.
>
> Sgt. Neil Nelson (NN): You can call your lawyer any time you want.
>
> MR: I probably better call her.
>
> Sgt. Michael Finley (MF): Okay. Any time you want.
>
> MR: Well, I don't know.
>
> * * * *
>
> MR: But if I call my lawyer, does that mean I can't talk to you no more?
>
> NN: No. We can come back and talk to you.

---

right to consult with a lawyer and to have the lawyer present during interrogation, and that, if indigent, a lawyer will be appointed to represent the accused.

2. A police report had been filed a week prior to L'Heureux's murder by a man who accused

appellant of slapping him several times. During his first custodial interview, appellant admitted slapping the wheelchair-bound man, alleging that the accuser had made an inappropriate comment about his girlfriend.

MR: Okay.

RP: If you wanna talk to us, you can talk to us. If you don't wanna talk to us * * *

MR: Yeah. *I wanna talk to you but I wanna talk to my lawyer, too.* Let her know I'm here.

RP: * * * you don't have to but you can talk to your lawyer, too. If you're concerned.

MR: Maybe I can get * * * sprung tonight, huh? I wish she could have been here.

NN: Well, do what you want. Do what you want.

MR: *I wanna call my lawyer.*

NN: That's fine.

* * * *

NN: In the morning, we'll come in there * * *

MR: Yeah.

NN: And if you don't wanna talk to us, you don't have to.

MR: I do wanna talk to you but I mean, I don't wanna stay in * * * jail if I don't have to.

NN: Sure. But unfortunately, you have to.

MR: There's nothin' my lawyer can do?

NN: Nothin' your lawyer can do.

MR: I'll have to call her.

NN: You call her. That's fine. And we'll be * * * we'll be back in the morning.

*The third interview*

Before police began their third interrogation of appellant the following day, appellant was given another *Miranda* warning and signed another form acknowledging he knew and understood his rights. The following exchange took place at that time:

MR: *I need to call my lawyer today, too.*

* * * *

MF: What time did you call her?

MR: * * * I got no watch. I don't know what * * * time it is.

RP: Okay. Well, keeping those in mind, do you still wanna chat?

MR: Well, yeah. It don't bother me.

Early on in the third interview, the police confronted appellant with information obtained from a former girlfriend that appellant had, in fact, been at St. John's Hospital on the day of the murder. Appellant conceded that during his previous statements he had somehow forgotten about his visit to the hospital. Appellant then changed his account, asserting that it might have been as late as six or seven o'clock in the evening when he visited L'Heureux's house that day.

During the third interview, the police investigators emphasized to appellant the difference in sentences between premeditated murder and second-degree murder or manslaughter. Appellant referenced his attorney during one exchange with investigators:

RP: Tell me the truth, Mark. Where are you gonna be on this scale?

MR: I don't know. *I have to speak to my lawyer* I guess * * * prosecutor. See what they think. I don't know * * * you guys have been nice to me. You understand, ya know.

A short while later, appellant referred to L'Heureux at one point as "my victim," and later compared his plight to that of O.J. Simpson by saying, "[Simpson] was definitely the murderer. Blood—and his victims were innocent. Mine wasn't."

Later in the interview, appellant acknowledged that he was speaking to the investigators against his counsel's wishes:

MR: *According to my lawyer,* I shouldn't be talking to you now.

RP: I'm sure she told you not to. And you made the choice.

MR: Well, I like you guys.

Appellant once again acknowledged that he knew his counsel did not want him speaking to the investigators on another occasion:

MF: Mark, we'll write this the way you tell it. Bottom line. But you gotta tell it.

MR: *My lawyer wouldn't like that.*

RP: Well, you're not doing what they want anyway. She said don't talk to ya?

MR: No. She said don't talk to the people who are in jail. She didn't say don't talk to you guys. But I know I shouldn't.

Appellant was convicted by the jury of first-degree premeditated murder and sentenced to life imprisonment.

## II. Discussion

On review, we will uphold a district court's factual determination of whether a defendant invoked the right to counsel unless it was clearly erroneous. *See State v. Miller,* 573 N.W.2d 661, 671 (Minn.1998). However, we must first review de novo the district court's legal conclusion that appellant needed to unequivocally assert his right to counsel in order to halt the custodial interrogation. *See State v. Camacho,* 561 N.W.2d 160, 170 (Minn. 1997) (legal questions reviewed de novo) (citing *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984)).

The Fifth Amendment to the United States Constitution and Article I, Section 7 of the Minnesota Constitution protect criminal defendants from compelled self-incrimination. In *Miranda v. Arizona,* the United States Supreme Court declared that an accused's right to have counsel present at an interrogation is indispensable to protecting an accused's Fifth Amendment privilege against compelled self-incrimination. 384 U.S. 436, 469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* created a system of procedural safeguards designed to protect this right, requiring police to give a warning alerting an accused to his or her right to have counsel present during interrogation. *Id.* at 471, 86 S.Ct. 1602. *Miranda* also required that, if an individual states that he or she wants an attorney, the interrogation must cease until an attorney is present.

*Id.* at 474, 86 S.Ct. 1602. If questioning does not cease after an accused requests that an attorney be present during questioning, evidence obtained as a result of the interrogation is not admissible against the defendant at trial. *Id.* at 479, 86 S.Ct. 1602. The Court emphasized in *Miranda* that the adoption of these prophylactic safeguards designed to protect criminal defendants' Fifth Amendment rights was not intended to "create[ ] a constitutional straitjacket which will handicap sound efforts at reform," but instead explained that states were encouraged to "continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws." *Id.* at 467, 86 S.Ct. 1602.

Building upon the foundation of *Miranda,* the Court held in *Edwards v. Arizona* that an accused who has "expressed his desire to deal with the police only through counsel * * * is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *Edwards* based its holding on the conclusion that it would be inconsistent with *Miranda* to allow police, on their own initiative, to resume custodial interrogation of an accused if the accused has *"clearly asserted his right to counsel."* *Id.* at 485, 86 S.Ct. 1602 (emphasis added).

After *Edwards,* lower courts grappled with the issue of how police should respond to equivocal or ambiguous requests for counsel. In *State v. Robinson,* we reviewed the varying tests employed by other state and federal jurisdictions, and adopted the following approach:

When a suspect indicates by an equivocal or ambiguous statement, which is subject to a construction that the accused is requesting counsel, all further questioning must stop except that narrow questions designed to "clarify" the

accused's true desires respecting counsel may continue.

427 N.W.2d at 223. We deemed this approach "more reasonable, pragmatic and fairer to the accused as well as to the state" than either the "per se bright line" approach – requiring interrogation to cease upon any request for counsel, no matter how equivocal or ambiguous – or the "totality of circumstances" approach. *Id.*

■ The Court addressed this issue in the 1994 case of *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362. The Court in *Davis,* while acknowledging the three competing approaches to a suspect's ambiguous or equivocal requests for counsel, went on to hold that defendants must clearly and unambiguously request counsel before they will be deemed to have invoked their Fifth Amendment right to counsel:

> As we have observed, "a statement either is such an assertion of the right to counsel or it is not." Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desires to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id.* at 459, 114 S.Ct. 2350 (internal citations omitted). While the Court conceded that "it will often be good police practice for the interviewing officers to clarify whether or not [an accused] actually wants an attorney," it declined to adopt a rule requiring officers to ask clarifying questions, stating that the Court was "unwilling to create a third layer of prophylaxis to prevent police

questioning when the suspect might want a lawyer." *Id.* at 461–62, 114 S.Ct. 2350.

Justice Souter, joined by three other justices, concurred in the judgment in *Davis* but took issue with the Court's determination that police investigators could disregard an accused's ambiguous references to counsel. Justice Souter's concurrence, citing the "concerns of fairness and practicality that have long anchored our *Miranda* case law," proposed a rule similar to the one we adopted in *Robinson:* "when law enforcement officials 'reasonably do not know whether or not the suspect wants a lawyer,' they should stop their interrogation and ask him to make his choice clear." *Id.* at 467, 114 S.Ct. 2350 (internal citations omitted).

■ On more than one occasion since the Court issued its decision in *Davis,* we have stated that we still consider the *Robinson* "stop and clarify" approach an appropriate prophylactic measure to protect an accused's rights against compelled self-incrimination under the Minnesota Constitution. *See State v. Parker,* 585 N.W.2d 398, 404–05 (Minn.1998) (acknowledging the federal "clear and unequivocal" standard of *Davis* but reaffirming that the *Robinson* approach applied to claims under the Minnesota Constitution); *State v. Juarez,* 572 N.W.2d 286, 290 (Minn.1997) (discussing *Davis* yet noting that we adopted a more protective rule in *Robinson* ).[3] We reaffirm the position that we expressed in both *Parker* and *Juarez:* in order to protect an accused's right against compelled self-incrimination under the Minnesota Constitution, police are required to cease questioning an accused once he or she has made an ambiguous or equivocal statement that could reasonably be construed as an invocation of the accused's right to counsel, except for narrow

3. Although we cited *Davis'* "unambiguous" invocation requirement in *State v. Miller,* 573 N.W.2d 661 (Minn.1998), we nonetheless concluded that the defendant in that case had in fact invoked his right to counsel. *Id.* at 671. We also acknowledged the Supreme Court's decision in *Davis* in *State v. Jones,* 566 N.W.2d 317 (Minn.1997). In *Jones,* the issue was not whether the defendant had requested counsel, but instead whether the defendant's request to speak to his mother was, in essence, a request to invoke either his right to silence or his right to speak with an attorney. *Id.* at 323–24.

questions designed to clarify the accused's true desires regarding counsel. Only if the narrow clarifying questions asked by the police confirm that the accused is not expressing a desire to deal with the police only through counsel may the police resume the custodial interrogation.

 We acknowledge that this rule provides more protection than is required by the United States Constitution. We do not cavalierly interpret our state constitution more expansively than the United States Supreme Court has interpreted the federal constitution. *See State v. Carter,* 596 N.W.2d 654 (1999); *State v. Fuller,* 374 N.W.2d 722, 726 (Minn.1985). However, the rule we announced in *Robinson,* and reaffirm here, is consistent with our "long tradition of assuring the right to counsel." *Friedman v. Commissioner of Pub. Safety,* 473 N.W.2d 828, 831 (Minn. 1991) (extending greater protection to criminal defendants under the Minnesota Constitution than extended by the Court's interpretation of the Sixth Amendment). Moreover, adoption of a different procedural safeguard than that prescribed by the Court is not even, in the strictest sense, a matter of constitutional interpretation. The *Miranda* right to counsel is not a right found in the Fifth Amendment, but instead a prophylactic rule fashioned by the Court to protect the right against coerced confessions. *See Davis,* 512 U.S. at 458, 114 S.Ct. 2350 (quoting *Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987)). Adoption of a different prophylactic rule designed to protect the accused's right against compelled self-incrimination is consistent with *Miranda*'s express desire not to create a "constitutional straitjacket which will handicap sound efforts at reform." *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602.

 We now consider whether appellant invoked his right to counsel during custodial interrogation. The Court indicated in *Edwards* that an invocation of the right to counsel is more than a mere reference to calling an attorney. 451 U.S. at 484, 101 S.Ct. 1880 (looking to whether defendant had "expressed his *desire to deal with the police only through counsel*") (emphasis added). Indeed, we have previously observed that "[o]ther courts following the *Robinson* approach have held that not every mention of the word 'lawyer' or 'counsel' or 'attorney' by a suspect 'arguably' suggests that the suspect wants a lawyer before submitting to further questioning." *State v. Hale,* 453 N.W.2d 704, 708 (Minn.1990). If a statement, viewed in the context in which it is made, does not even arguably suggest that the accused is asserting that he or she does not wish to continue the custodial interrogation without the aid of counsel, then continuation of the interrogation is proper. *See id.* (concluding from the context surrounding a defendant's "fleeting, off-hand comment in mid-sentence" that the comment was "not even arguably an invocation of his *Miranda* right to counsel").

Appellant asserts that he invoked his right to counsel in the second interview when he stated during the interview's later portions that "I wanna call my lawyer." Viewed in isolation, this statement appears to be a request for counsel. However, taken in context, this statement did not represent a request to terminate the interrogation until his counsel was present.

 the second interview drew to a close, appellant inquired whether he could call his lawyer. The police then told appellant he could do that at "any time." Appellant made clear that he wanted to continue talking to the police, but wanted to speak to his lawyer for the purpose of letting her know he was in custody. The transcript reveals that appellant's concern was not in ending the interview, but instead in finding out if he could be released on bail that evening. Appellant then reiterated: "I wanna call my lawyer." The police told him "that's fine," adding, "if you don't wanna talk to us, you don't have to." Appellant then again made clear his intentions, stating "I do wanna talk to you but * * * I don't wanna stay in jail." This exchange demonstrates that appellant was

simply talking about calling his attorney after the interview to see if he could obtain a release on bail, not trying to halt the interrogation.

At the outset of the third interview, immediately after receiving a fresh *Miranda* warning, appellant stated: "I need to call my lawyer today, too." This request for counsel was at best ambiguous, because appellant merely stated he needed to contact his lawyer sometime that day. In accordance with the *Robinson* approach, the police then clarified appellant's intent, asking "do you still wanna chat," to which appellant replied: "Well, yeah. It don't bother me." The ambiguous invocation, followed by a clarifying question, followed by appellant's direct statement that he was interested in continuing the conversation did not violate appellant's constitutional rights.

Finally, appellant points to another instance of a possible invocation of counsel later in the third interview. During the third interview, the police tried to impress upon appellant the significantly lighter sentence he might receive if he admitted to killing L'Heureux in self-defense. Referring to the sentencing guidelines, an investigator asked appellant: "Where are you gonna be on this scale?" Appellant responded: "I have to speak to my lawyer I guess. * * * prosecutor. See what they think. I don't know * * * you guys have been nice to me." This fleeting remark by appellant to a possible future discussion with his attorney did not constitute an invocation of appellant's right to terminate the interrogation until his counsel was present.

Even if any of appellant's statements had constituted an invocation of his *Miranda* right to counsel, the jury's verdict was surely unattributable to the error and admission of his custodial statements would therefore be harmless beyond a reasonable doubt. *See Juarez*, 572 N.W.2d at 291 (stating that error is harmless beyond a reasonable doubt when the verdict rendered is "surely unattributable" to the error). The appellant's statements to police never amounted to a confession, and there was overwhelming independent evidence presented against appellant at trial, including testimony from two individuals who told the jury that appellant confessed to them that he committed the murder.

In summary, we hold that when an accused makes an ambiguous or equivocal statement that can reasonably be interpreted as a request for counsel, the police must stop all questioning at that time except for narrow questions designed to clarify the accused's intentions. Because the police investigators properly clarified appellant's only ambiguous reference to counsel, they were under no obligation to cease custodial interrogation. Therefore, the district court properly denied appellant's motion to suppress his custodial statements to police and his conviction is affirmed.

Affirmed.