**STATE of Minnesota, Respondent,**

v.

**Hector Manuel MEDRANO, Appellant.**

**No. A07–1437.**

Supreme Court of Minnesota.

June 26, 2008.

John M. Stuart, Public Defender, Susan J. Andrews, Asst. Public Defender, St. Paul, for Appellant.

Lori Swanson, Atty. General, Peter Reed Marker, Asst. Atty. General, St. Paul, Paul James Kiltinen, Dodge County Atty., Mantorville, for Respondent.

## OPINION

ANDERSON, Paul H., Justice.

On April 17, 2005, Hector Manuel Medrano confessed to the murder of Jose Gallegos. After a full trial on the merits, a Dodge County jury found Medrano guilty of first-degree premeditated murder, in violation of Minn.Stat. § 609.185(a)(1) (2006); first-degree felony murder, in violation of Minn.Stat. § 609.185(a)(3) (2006); and second-degree intentional murder, in violation of Minn.Stat. § 609.19, subd. 1(1) (2006). The Dodge County District Court convicted Medrano of first-degree premeditated murder and sentenced him to life imprisonment. Medrano now appeals, arguing that the admission of his confession at trial was prejudicial error that entitles him to a new trial. We affirm.

The essential facts on this appeal are not in dispute. On March 21, 2005, Jose Galle-gos did not come to work at his job with McNeilus Truck and Manufacturing in Dodge Center. Someone claiming to be Gallegos's nephew called McNeilus later that day and said that Gallegos had gone to Mexico to take care of an emergency. Gallegos's friend and co-worker, Jesse Torres, did not believe that Gallegos would go to Mexico without telling him and urged his supervisor to contact the police. In early April, when Gallegos remained missing from work, someone at McNeilus contacted the Dodge County Sheriff's Department about Gallegos's absence. Around the same time, Gallegos's neighbor told the Sheriff's Department that she noticed Gallegos had not been home for an extended period of time and that several very loud, "shady, seedy-looking people" were going in and out of Gallegos's house.

On April 8, 2005, Investigator Jeremy Gunderson and Deputy Ryer Anderson went to Gallegos's house to investigate Gallegos's disappearance. Salvador Galle-gos, Gallegos's nephew, answered the door and consented to a search of the house. When searching the house, Gunderson and Anderson found appellant Hector Manuel Medrano with two young women—K.R. and S.B.—in a back bedroom. Gunderson asked Medrano about Gallegos, and Medrano stated that Gallegos had gone to Mexico and was in treatment. When asked to identify himself, Medrano provided Gunderson and Anderson with a false name. But the officers subsequently found a wallet in the bedroom that contained Medrano's driver's license. When the officers ran a search of Medrano's name, they discovered that a body-only warrant had been issued for him. Medrano was then taken into custody and the officers continued to search Gallegos's house. During their search, the officers discovered Gallegos's Jeep in the garage and seized, among other things, black gar-

bage bags and cleaning products found around the Jeep, keys to Gallegos's Jeep, two ends of a coaxial cable, an insurance card with Gallegos's name on it, and Gallegos's Minnesota driver's license and his passport.

Medrano was detained at the Freeborn County jail in Albert Lea as a result of the body-only warrant. While in jail, Medrano told another inmate, Robert King, that he had killed someone. According to King, Medrano explained that the man he killed was someone he was staying with and that this man was treating Medrano's friend— the man's nephew—badly. Medrano went on to tell King that he stabbed the man and put a belt around his neck. Medrano then showed King his finger and said he had cut it during the incident. Medrano stated that after he killed the man, he rolled the man's body up in plastic or a blanket and he and his friend moved it, first to the basement of the house and eventually somewhere else. He also told King that he told the police that the man had gone to Mexico. King relayed this information to a Freeborn County jail guard. The report was then referred to a Freeborn County Deputy, who contacted the Rochester Police Department. The Rochester police checked their own missing persons reports and those of the Olmsted County Sheriff's Office, but none fit the description King had provided. Medrano was subsequently released from the Freeborn County jail.

On April 14, 2005, Gallegos's body was discovered in Pine Island Township. His body was in a ravine, wrapped in canvas with coaxial cables wound around it. At approximately 2:30 a.m. on April 15, Gunderson and other officers executed a search warrant at Gallegos's house. Medrano and K.R. both were inside the house at the time. Both of them were transported to the Dodge County Sheriff's Office

and questioned. When questioned, Medrano denied any involvement in the death of Gallegos. After Medrano and K.R. were interviewed, they were taken to a hotel room because Gallegos's house had been secured for the execution of the search warrant. Later that day, after learning about the information that Medrano had given to King while in jail, officers arrested Medrano for the murder of Gallegos. Just before his arrest, Medrano was questioned for the second time about the murder but again denied any involvement.

On Sunday, April 17, Sergeant Luke Nash transported Medrano to the Dodge County Sheriff's Office for a third police interview. While in Nash's vehicle, Medrano told Nash that he had not slept very well and was not "feeling very good." Medrano then told Nash that he planned to give a confession to the police and asked Nash to call ahead to request a male interviewer.

Chief Deputy James Trihey conducted the April 17 interview of Medrano at the Dodge County Sheriff's Office. Trihey gave Medrano a *Miranda* warning and asked if Medrano was willing to speak with him. Medrano responded with the following statement: "Yes, but I have just one question. So if I ask for a lawyer now, will there be a lawyer present now?" Trihey explained that it was not likely that Medrano would be able to speak to an attorney until the next day. He also explained that if Medrano asked for an attorney, the interview would stop and the police would not speak to Medrano until he spoke to an attorney. Medrano then stated he still wanted to speak to Trihey and went on to confess to murdering Gallegos.

Medrano explained that in March, he was staying at a hotel in Rochester, Minnesota, when he met Salvador. Salvador had no place to stay, so Medrano

invited Salvador to stay with him at the hotel. But Medrano had to check out of the hotel within a few days because he was running out of money. Eventually, the two men got a ride to Dodge Center and Salvador took Medrano to Gallegos's house.

When Salvador and Medrano arrived at Gallegos's house, no one was home, but Salvador had a key. After the two went inside, Medrano fell asleep for a few hours and when he woke up Salvador indicated that he wanted to leave. According to Medrano, Salvador said that he and Gallegos did not get along. The two men left but returned to the house three times during that day. The final time they returned to the house, Gallegos was home.

When Gallegos opened the door to Salvador and Medrano, Salvador and Gallegos talked for a minute and then Gallegos began accusing Salvador of taking one of Gallegos's phone or credit cards. Eventually Medrano and Salvador went to a back bedroom and Salvador told Medrano that they could not stay at Gallegos's house. After talking to Salvador about his relationship with Gallegos, Medrano then said to Salvador, "you act like you wanna kill him." Salvador replied, "I do, but." The conversation eventually ended and Salvador and Medrano left Gallegos's house.

After leaving the house, Salvador and Medrano discussed finding a ride back to Rochester and staying at a shelter. After they were unable to think of anyone to give them a ride to Rochester, they decided to return to Gallegos's house. During the walk back, they started talking about killing Gallegos. They discussed different options such as beating Gallegos, tying him up and taking him to the basement, or stabbing him with the knife that Salvador had with him. At some point during the conversation, Salvador gave Medrano his knife.

When Salvador and Medrano arrived at Gallegos's house again, Gallegos answered the door and the two men went inside. According to Medrano, at that point he and Salvador "started to go towards" Gallegos "a couple of times" but then stopped, and Medrano retreated to the back bedroom. Salvador stayed in the kitchen area and according to Medrano, Salvador "was waiting on [Medrano] and [Medrano] was waiting on [Salvador]." Then Medrano came out of the bedroom to "[t]ry[ ] to find an opportunity." Medrano then lit a cigarette while Gallegos was sitting nearby. When Medrano finished smoking his cigarette, he returned to the bedroom. Gallegos then went to the bathroom and according to Medrano, Salvador said to Medrano, "as soon as he comes out of the bathroom, we'll get him then." Medrano replied, "all right." When Gallegos came out of the bathroom, Salvador and Medrano came out of the bedroom and looked at each other, each waiting for the other to make the first move, but nothing happened. Medrano returned to the bedroom and Salvador went to the kitchen. Gallegos then said something, grabbed the phone, and headed toward his bedroom.

According to Medrano, this is when he and Salvador both "snapp[ed]." The two men went into the hallway and grabbed Gallegos. Medrano had the knife that Salvador had given him, and he used it to stab Gallegos in the back. Gallegos turned around, and this movement caused Medrano to cut his finger with the knife. Medrano then stabbed Gallegos in the back again while Gallegos was on the floor. At this point, Salvador took off his belt and used it to tie Gallegos's hands. Medrano said he had expected Gallegos to die quickly after being stabbed in the back, but when Gallegos did not die, Medrano stabbed him in the chest. Gallegos stopped moving after being stabbed in the chest. Medrano then

took off his own belt and used it to tie Gallegos's feet.

Gallegos was still breathing at this point. Medrano then found another belt, put it around Gallegos's neck, and pulled back on it until Gallegos stopped breathing. Medrano then asked Salvador if he thought Gallegos was unconscious or dead. Salvador said he thought Gallegos was dead. Medrano and Salvador then took Gallegos's body down to the basement, put it on a blanket, and left it there.

Salvador started cleaning the house with bleach. He then left with one of Gallegos's credit cards, took some money out of an ATM, and rented a shampooing carpet cleaner. When Salvador returned, he and Medrano attempted to clean the house with the vacuum and some other cleaning products. At some point they gathered up all of their clothes and the shirt that Gallegos was wearing when he was killed and put them in a black bag. Medrano washed the knife he used to stab Gallegos, gave it back to Salvador, and told him to get rid of it. During the interview, Medrano described the knife and drew a picture of it.

Medrano explained to Trihey that he knew the murder took place on a Sunday because Gallegos had to be at work the next morning. Medrano stated that on Tuesday or Wednesday he called McNeilus Truck and Manufacturing, where Gallegos was employed, and told someone there that Gallegos had a family emergency in Mexico and would be back in a few days.

After 3 or 4 days, the body began to smell. That night, Salvador wrapped the body in a tarp and a cable, but it was another few days before he and Medrano actually removed it. During this time, Salvador used Gallegos's credit cards to buy various items. Salvador and Medrano also pawned some of the items in Gallegos's house, such as CDs, a television, a sander,

and a drill. About a week after the murder, Salvador and Medrano took Gallegos's body, put it in his jeep, and drove toward Rochester. They stopped near some woods, took out the body, and rolled it into a ditch.

After Medrano finished confessing to the murder of Gallegos, Trihey ended the interview and Sergeant Nash transported Medrano back to the jail. During the ride, Medrano told Nash that he was "feeling much better." Medrano also said that he wanted to relay some more details to Trihey about the murder. Medrano then began to tell Nash about the location of the knife and other items connected to the murder. Nash stopped Medrano and said that Medrano should tell that information to Trihey but that Nash would pass it along to the appropriate people.

The next day, Medrano told Gunderson that the knife used to kill Gallegos was located at a car wash in Rochester. Gunderson drove Medrano to the car wash, and Medrano indicated the bay in which the knife was hidden. Police officers recovered the knife in the location that Medrano identified.

Medrano was subsequently indicted for first-degree premeditated murder, in violation of Minn.Stat. § 609.185(a)(1) (2006), and first-degree felony murder, in violation of Minn.Stat. § 609.185(a)(3) (2006). At an omnibus hearing, Medrano argued that the district court should suppress his April 17 confession because he did not "clearly and unequivocally" waive his right to counsel. The court ruled that the confession was admissible because when Medrano asked Trihey when he would be able to obtain an attorney if he asked for one, Trihey asked Medrano the clarifying questions required by *State v. Risk*, 598 N.W.2d 642 (Minn. 1999), and Medrano subsequently agreed to speak to Trihey.[1]

1. In *State v. Risk*, 598 N.W.2d 642, 648–49 (Minn.1999), we concluded that

At trial, Trihey testified about the April 17 interview with Medrano. The interview, which lasted over 2 and one-half hours, was then played for the jury in its entirety. Robert King testified to what Medrano had told him about the murder of his friend's uncle when the two were in jail together. A forensic pathologist testified that Gallegos had four stab wounds, one of which was on the left side of his chest. She stated that the wounds could have been caused by a knife. She further testified that there was evidence that Gallegos could have been choked. A State expert also testified that the following items found in Gallegos's house had Medrano's DNA on them: four belts, blood found on a door jamb, and a pair of jeans found in one of the bedrooms. Further, an expert testified that one of the garbage bags found near Gallegos's body came from the same roll as one of the garbage bags found in Gallegos's garage. Another expert testified that the coaxial cables found wrapped around Gallegos and the cable end connectors found at Gallegos's home fit together and that "the cable could've been connected at one time to the connecters." The State also presented evidence that Salvador rented a carpet cleaner and that he had pawned property at a pawn shop the day after Gallegos's murder. Evidence also showed that Medrano pawned a saw, a television, CDs, a sander, and a drill after Gallegos's murder.

Medrano testified on his own behalf. His testimony was consistent with the confession he gave to Trihey during the April 17 interview. The jury found Medrano guilty of first-degree premeditated murder, first-degree felony murder, and second-degree intentional murder. *See* Minn. Stat. §§ 609.185(a)(1) (2006), 609.185(a)(3) (2006), 609.19, subd. 1(1) (2006). The district court sentenced Medrano to life imprisonment for first-degree premeditated murder. Medrano now appeals, arguing that the district court should have suppressed his confession because the *Miranda* warning given before the police questioned him impermissibly linked his right to counsel to a future event.

■ In *California v. Prysock*, the United States Supreme Court emphasized that it has never required a "talismatic incantation" of the *Miranda* warning. 453 U.S. 355, 360, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). Instead, courts "examine[ ] the warnings given to determine if the reference to the right to appointed counsel was linked with some future point in time after the police interrogation." *Id.* at 360, 101 S.Ct. 2806. In *Prysock*, because the defendant was warned that he had a right to an attorney before and during questioning, the Court concluded that it was " 'not a case in which the defendant was not informed of his right to the presence of an attorney during questioning * * * or in which the offer of an appointed attorney was associated with a future time in court.' " *Id.* at 361, 101 S.Ct. 2806 (quoting *United States v. Noa,* 443 F.2d 144, 146 (9th Cir.1971)) (omission in original).

The Supreme Court later clarified the meaning of *Prysock*. In *Duckworth v. Eagan,* a defendant was given the following warning:

> Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in

---

in order to protect an accused's right against compelled self-incrimination under the Minnesota Constitution, police are required to cease questioning an accused once he or she has made an ambiguous or equivocal statement that could reasonably be construed as an invocation of the accused's right to counsel, except for narrow questions designed to clarify the accused's true desires regarding counsel.

court. *You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.* You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer.

492 U.S. 195, 198, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (emphasis in original). The Indiana Supreme Court upheld the conviction in *Duckworth. Id.* at 199, 109 S.Ct. 2875. The defendant then sought a writ of habeas corpus, which the United States District Court for the Northern District of Indiana denied. *Id.* The Court of Appeals for the Seventh Circuit reversed, concluding that the *Miranda* warning given implied that only an accused who can afford an attorney can have one present before answering questions and that if the defendant does not go to court, he is not entitled to counsel at all. *Id.* at 200, 109 S.Ct. 2875. But the Supreme Court reversed the Seventh Circuit Court of Appeals. *Id.* at 205, 109 S.Ct. 2875. The Court stated that *Prysock* stood for the proposition that a *Miranda* warning is insufficient only if it links the right to counsel to some future time *after* interrogation. *Id.* at 204, 109 S.Ct. 2875. The Court concluded that because the defendant in *Duckworth* was told he had a right to counsel *before* questioning, and considering the totality of the warning, the warning was sufficient. *Id.* at 205, 109 S.Ct. 2875. The Court also noted that under Indiana law, the warning was accurate because in Indiana, counsel is appointed at the defen-

dant's first court appearance. *Id.* at 204, 109 S.Ct. 2875.

In *State v. Crisler*, decided 2 months before *Duckworth*, we faced the same question of whether a warning is inadequate when it fails to state that the defendant has the right to counsel before and during questioning, and the warning implies that the defendant's right to counsel is linked to some future point in time. 438 N.W.2d 670, 671 (Minn.1989). We recognized that under *Prysock*, a warning is defective if it implies the defendant can obtain counsel only at some future time after interrogation. *Id.* But we declined to determine whether the warning in *Crisler* was adequate because we concluded that any error was harmless. *Id.* at 672.

Nevertheless, in *Crisler* we warned that "a cryptic or paraphrased warning or a warning that deviates from the standard *Miranda* warning may later be determined.* * * to be inadequate." *Id.* We went on to state, however, that police officers "who clearly and completely give a standard form *Miranda* warning containing [the] four carefully-worded individual warnings, or their equivalent, need not fear a later determination by this court that the warnings given were inadequate or misleading." *Id.; see also State v. Needham*, 488 N.W.2d 294, 295 n. 1 (Minn. 1992) (reiterating that a police officer who reads the standard form *Miranda* warning "need not fear a later determination by this court that the warning given was inadequate or misleading"). We indicated that the *Miranda* warning should contain the following four individual warnings:

(1) the suspect has the right to remain silent; (2) any statements made can and will be used against the suspect in a court of law; (3) the suspect has the right to talk to an attorney before being questioned and to have the attorney present during questioning by police;

and (4) if unable to afford to hire an attorney, one will be appointed at no cost before any questioning if so desired. *Crisler,* 438 N.W.2d at 672.

In this case, the April 17 interrogation in question began with Chief Deputy Trihey giving Medrano the following *Miranda* warning:

Q: Okay. And before we get started, Hector, I'm going to read you what is called the Miranda warning. Okay? (Pause) You have the right to remain silent. (Pause) Anything you say can and will be used against you in a court of law. (Pause) You have the right to talk to a lawyer now and have a lawyer present now or at any time during questioning. If you cannot afford a lawyer, one will be appointed for you without cost. (Pause) Do you understand each of these rights that I have explained to you?

A: Yes

Q: Okay. (Pause) And having these rights in mind, will you talk to me? (Pause)

A: Yes, but I have just one question. So if I ask for a lawyer now, will there be a lawyer present now?

Q: If you ask for a lawyer right now, (Pause) we'll stop the interview. We won't talk to you anymore until a lawyer can represent you but chances are you won't be able to talk to a lawyer until tomorrow. (Pause) And so we wouldn't, we wouldn't talk to you anymore until then. (Pause) So that, that's up to

you. If you want to, if you want an attorney (Pause) then, then we have to stop right here. (Pause)

A: Okay.

Q: So you have to (Pause) make that decision (Pause) on whether you want to talk to me or, or you don't.

A: I'll talk to you.

Medrano asserts that the *Miranda* warning given at this interview was confusing and misleading because Trihey promised Medrano the right to an attorney "now" and then withdrew that right and linked it to a future event when he indicated that Medrano would likely be unable to speak to an attorney until the next day. Medrano argues that because the *Miranda* warning was invalid, his waiver of his *Miranda* rights was also invalid, making his subsequent confession inadmissible.[2] The State responds that the *Miranda* warning given was proper under *Crisler,* and that because the warning did not violate *Prysock* and *Duckworth* by linking the right to counsel to a future event after questioning, the warning was constitutionally sound.

The *Miranda* warning initially given to Medrano was nearly identical to the warning we set out in *Crisler. See* 438 N.W.2d at 672. The only substantive difference between the *Crisler* warning and the one given to Medrano is the use of the word "now" versus the term "before questioning." In *Crisler,* the warning indicated that an accused has "the right to talk to an attorney *before being questioned* and to have the attorney present during questioning." *Id.* (emphasis added). In this case, Trihey told Medrano that he had "the

**2.** Medrano admits that at the district court he argued that he did not clearly and unequivocally waive his right to counsel and not that the *Miranda* warning linked his right to counsel with some future event. But Medrano asserts that because a confession is not admissible unless a defendant's waiver of his *Mi-*

*randa* rights was valid, the district court implicitly concluded that Medrano's *Miranda* waiver was valid. The State agrees that had the district court been presented with the issue currently before us, the district court would have likely found that Medrano's waiver was valid.

right to talk to a lawyer *now* and have a lawyer present *now* or at any time during questioning." (Emphasis added.) We conclude that the term "now" accurately and clearly described Medrano's right to an attorney before questioning, which at the time the warning was given, was taking place *now.* Further supporting our conclusion is the fact that the term "now" is used instead of the term "before questioning" on the Hennepin County Attorney's *Miranda* card we endorsed in a footnote in *Crisler. See id.* at 672 n. 2.

Moreover, in the statement that Trihey made in response to Medrano's inquiry about when he could obtain an attorney, Trihey stated four times that if Medrano asked for an attorney, Trihey would stop the interview. More particularly, Trihey said:

1) "[i]f you ask for a lawyer right now, (Pause) we'll stop the interview";

2) "[w]e won't talk to you anymore until a lawyer can represent you";

3) "chances are you won't be able to talk to a lawyer until tomorrow[,][a]nd so we wouldn't * * * talk to you anymore until then"; and

4) "if you want an attorney * * * then we have to stop right here."

We conclude that by making these statements, Trihey made it clear that if Medrano invoked his right to have an attorney "now," then even if no attorney were available until the next day, Medrano's right to an attorney would be honored—the interrogation would cease until Medrano obtained an attorney. Thus, we conclude that Trihey accurately and unambiguously conveyed Medrano's *Miranda* rights by indicating that Medrano had the right to an attorney *before* any police questioning. Because the *Miranda* warning complied with *Duckworth* and *Prysock* by not linking Medrano's right to counsel to a future time *after* interrogation, we conclude that the warning given to Medrano was constitutionally sufficient.

 We further conclude that Trihey's statements that Medrano would not likely "be able to talk to a lawyer until tomorrow" did not make the warning constitutionally flawed. Again, the warning given to Medrano is insufficient only if it links the right to an attorney to a future event *after* interrogation. *See Duckworth,* 492 U.S. at 204, 109 S.Ct. 2875. Here, Trihey made it clear that if Medrano invoked his right to an attorney, no interrogation would take place until Medrano spoke to an attorney. The Supreme Court has said that a statement indicating when an attorney will be appointed "simply anticipates" the defendant's question of when he will be able to obtain an attorney. *Id.* at 204, 109 S.Ct. 2875. In this case the statement was not merely in anticipation of, but in response to, Medrano's question about when he would be able to speak to an attorney. Moreover, as in *Duckworth,* Trihey's statements that Medrano would likely be unable to speak to an attorney until the next day appears to be an accurate statement because it was 7:00 p.m. on a Sunday and therefore it was not likely that the police would be able to contact any attorneys at that time.

 Importantly, the Supreme Court has made it clear that "*Miranda* does not require that attorneys be producible on call," but only that the suspect is informed of his right to appointed counsel before and during questioning, and that, if police cannot provide appointed counsel, they "not question a suspect unless he waives his right to counsel." *Duckworth,* 492 U.S. at 204, 109 S.Ct. 2875. Thus, Trihey's statement satisfied *Duckworth* because it clearly conveyed Medrano's right to an attorney before police questioning and did not impermissibly link Medrano's right to

an attorney to a future time *after* interrogation.

Medrano nevertheless asserts that his case is distinguishable from *Duckworth* because under Indiana law a suspect is appointed an attorney at his first appearance, making the warning in *Duckworth* accurate. On the other hand, under Minn.Stat. § 611.262 (2006), in certain circumstances an accused may obtain an attorney before his first appearance. Medrano argues that because he could have had access to an appointed attorney before his first court appearance, Trihey's statement that Medrano would not likely be able to obtain an attorney until the next day failed to accurately articulate Medrano's rights.

Medrano is mistaken that *Duckworth* turned on the fact that suspects in Indiana are not entitled to an appointed attorney until their first court appearance. While the Supreme Court began its analysis in *Duckworth* by pointing out that the warning about an appointed attorney was accurate under Indiana law, the Court went on to set out the principles discussed above and to reiterate that *Prysock* requires only that the right to an appointed attorney not be linked to a future point after interrogation. 492 U.S. at 204, 109 S.Ct. 2875. *Duckworth*, therefore, did not turn on the *Miranda* warning's accuracy under a specific state law. Moreover, as stated above, Trihey's statement that Medrano would not likely be able to see an attorney until the next day was an accurate statement considering the circumstances.

Finally, Medrano makes the alternative argument that the Supreme Court has retreated from the rationale underlying *Duckworth*. In *Dickerson v. United States*, the Court held that the *Miranda* opinion set forth a constitutional rule that cannot be superseded by Congress. 530 U.S. 428, 429, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Medrano asserts that under *Dickerson*, a *Miranda* warning that passed constitutional muster in the past may no longer be valid. But as the State asserts, nothing in *Dickerson* suggests that a stricter reading of *Miranda* is now required or that the traditionally accepted *Miranda* warning is constitutionally flawed. *See id.* at 431–44, 120 S.Ct. 2326. The Court in *Dickerson* simply held that Congress cannot provide its own method of determining whether an accused's in custody statement is made voluntarily. *See id.* at 444, 120 S.Ct. 2326. Moreover, as discussed above, Trihey's *Miranda* warning to Medrano clearly and unambiguously conveyed to Medrano his right to an attorney before questioning.

For all the foregoing reasons, we conclude that the *Miranda* warning given to Medrano was not constitutionally flawed. Accordingly, there is no merit to Medrano's argument that his subsequent waiver of his *Miranda* rights was invalid.[3] Therefore, we hold that the district court did not err when it concluded that Medrano's confession was admissible at trial.

Affirmed.

3. Medrano does not argue any other basis for us to conclude that his waiver of his *Miranda* rights was not made voluntarily, knowingly, and intelligently. The record also indicates that it was Medrano who asked to speak to the police before the April 17, 2005 interview. Further, on the way to the interview, Medrano voiced to the officer who was driving him to the police station that he had not been sleeping well and that he planned to confess to the murder. After the interview, on the way back to jail, Medrano told the same officer that he was feeling much better and that he wanted to tell Trihey more details about the murder. This sequence of events does not support a claim that Medrano's waiver of his *Miranda* rights was invalid.

MAGNUSON, C.J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.