LILLEHAUG, Justice.
Appellant Antionette Rie Johnson was charged with the first- and second-degree murder of Renaldo McDaniel on an aiding-and-abetting theory. A jury found Johnson guilty on both counts, and she was sentenced to life imprisonment without the possibility of release. On direct appeal, Johnson raises three issues. First, she argues that the district court erred by admitting into evidence a statement police obtained in violation of her constitutional rights. Second, she contends that the district court erred by giving a no-adverse-inference instruction to the jury without her consent. Third, she asserts that the *742 prosecutor committed misconduct during closing argument by alluding to her failure to testify. We affirm Johnson's conviction.
FACTS
On June 12, 2016, at 8 p.m., Daryl Curtis shot and killed Renaldo McDaniel in the parking lot of an auto parts store in Saint Paul. See State v. Curtis , 905 N.W.2d 609, 612-14 (Minn. 2018). Police obtained surveillance footage from a nearby Walmart and a childcare center. The footage from Walmart showed that, before the shooting, Curtis was accompanied by two women, T.S. and Johnson, and that Johnson was driving a maroon SUV. The footage from the center showed that this SUV stopped just before 8 p.m., Curtis got out and tucked something into the back of his pants, and, 3 minutes after McDaniel was shot, Curtis ran down an alley and the same SUV pulled up by him and drove away.
About 90 minutes after the shooting, Johnson received a call from her boyfriend, J.C. J.C. is Curtis's cousin, and was in jail at the time. During this call, Johnson told J.C.: "So um, you know dude, uh dark skinned? With the braids? ... Well, he's outta here." J.C. asked, "What happened?" and Johnson replied, "He's just, he's outta here. Like gone, forever."
Ten days later, on June 22, a Saint Paul police officer saw Johnson and the maroon SUV at a gas station. Johnson, along with her 8-month-old son, was taken to the police station for questioning.
At the station, Johnson was questioned for about 2 hours by a single plainclothes officer. Johnson's son was in the interrogation room at the start of questioning. Johnson was read her Miranda rights, and was twice told that she had the right to an attorney. Johnson stated that she understood her rights. During questioning, Johnson confirmed that on June 12: (1) she was with T.S. and Curtis; (2) she was driving the maroon SUV; (3) Curtis left the SUV and walked in the direction of the auto parts store, the scene of the shooting; (4) she picked Curtis up at 8:01 p.m., after the time of the shooting; and (5) she received the jailhouse call from J.C.
During questioning, Johnson offered her own version of these events. Johnson told the officer that, accompanied by T.S. and Curtis, she had driven to Dairy Queen to pick up dinner for her son. Dairy Queen was next to the auto parts store. The line at Dairy Queen was long, so Johnson decided to go to White Castle instead. On the way to White Castle, she dropped Curtis off on Aurora Avenue, near the auto parts store, so he could walk to his uncle's house. While in line at White Castle, she received a call from Curtis-two minutes after she had dropped him off-telling her that his uncle was not home. Johnson picked Curtis up, again on Aurora Avenue.
Johnson's story was inconsistent with surveillance footage, and other evidence also suggested that her story was false. Despite being presented with those inconsistencies, Johnson held firm to her story. Notably, Johnson never confessed to any involvement in the murder.
During questioning, the officer made multiple references to Johnson's son. He told Johnson that, if convicted of murder, she would spend 40 years in prison, and asked, "would you be able to raise your son?" Johnson replied, "No." The officer told Johnson that "I would like to see you be able to raise your son, so your son ... is not raised in foster care," to which she responded, "that's why I'm trying to figure out what, what's going on." Several minutes later, the officer reminded Johnson that if she did not tell the truth she could go to jail and not be able to raise her son.
*743 About halfway through questioning, Johnson's son was removed from the room. Johnson then asked the officer, "[C]an I get my lawyer's number [on] my phone?" The officer replied, "Yep you'll be able to get that," and told Johnson that "[I] just want[ed] to let you know that I'm not playing." Johnson responded, "Yeah neither am I ... that's why I'm gonna call ... I'm gonna get a lawyer." She then said: "But I wouldn't have sat here and talked to you, I could've just 'Oh I want my lawyer.' " Johnson did not call a lawyer, and continued talking to the officer. At the end of the interview, the officer advised Johnson: "Your baby's gonna be placed [in] foster care [be]cause you're going to jail."
Johnson was booked following the interview. Later, a grand jury indicted her on two counts: first-degree premeditated murder and second-degree intentional murder, each on an aiding-and-abetting theory. See Minn. Stat. § 609.05, subd. 1 (2016) ; Minn. Stat. § 609.185(a)(1) (2016) ; Minn. Stat. § 609.19, subd. 1(1) (2016).
Before trial, Johnson filed a motion to suppress several pieces of evidence, including her June 22 statement to police. Johnson's motion asserted that her statement was involuntary because police had described the penalty for first-degree murder and threatened to take her son away. Her supporting memorandum did not raise the involuntariness issue, and instead argued that her statement should be suppressed because the questioning officer "ignored her unequivocal and unambiguous request" for counsel. The State contested Johnson's motion on both grounds, and the district court denied the motion. A jury trial commenced in May 2017.
Most of the State's trial evidence linking Johnson to the shooting came from three sources: phone records, the jailhouse call between Johnson and J.C., and T.S.'s testimony.[1] T.S. testified to the following facts.
T.S. had been dating Curtis, and she knew Johnson because Johnson was dating Curtis's cousin, J.C. On June 12, T.S. and Curtis took a light rail train from Minneapolis to Saint Paul to get a part for Curtis's car. While on the train, Curtis received a call from Johnson, who told him that there was a birthday barbecue for his cousin-T.C.-that night. T.S. and Curtis agreed to attend, and Johnson picked them up in her maroon SUV. They went to Walmart and Cub Foods to pick up supplies for the barbecue.
Johnson then drove Curtis and T.S. to the auto parts store. While driving through the parking lot, Curtis noticed McDaniel's vehicle and told Johnson to keep driving. Johnson and Curtis were interested in McDaniel because, the prior fall, McDaniel had shot J.C. Curtis took a picture of the vehicle's license plate, sent the image to T.S. by text message, and said "[t]here goes ... Renaldo."
Johnson drove out of the parking lot and pulled into the drive-through lane at the nearby White Castle. While waiting in line, Johnson and Curtis looked back to the parking lot to see if McDaniel's vehicle was still there. It was. Johnson then backed out of the White Castle drive-through and drove to Aurora Avenue, stopping just north of the auto parts store and across the street from the childcare center.
Johnson put her purse on the center console and told Curtis that there was a gun in it. Curtis took the black semi-automatic handgun out of the purse and left the vehicle. Johnson then drove to Lexington Avenue, passing the auto parts store.
*744 Johnson told T.S. to text Curtis that McDaniel was "looking under the hood." T.S. did so.
Moments later, Johnson received a call from Curtis. She said, "I'm on my way," and, "Tell me exactly where you are at." Johnson drove to an alley near the auto parts store, and Curtis got back in the vehicle. Curtis placed the gun back in Johnson's purse and told her that he had shot McDaniel. Johnson smiled and drove off.
Other evidence corroborated key aspects of T.S.'s testimony, including: (1) surveillance footage showed Curtis exiting Johnson's SUV before the shooting; (2) following the shooting, an employee from the auto parts store saw Curtis running with a black semi-automatic handgun; (3) phone records confirmed that Johnson received two phone calls from Curtis on June 12 at 8:01 p.m.; and (4) surveillance footage from after the shooting showed Curtis walking through an alley, the SUV pulling up to the end of the alley, and the vehicle driving away. The audio recording of the June 12 phone call between Johnson and J.C. showed that Johnson had knowledge of the murder, and corroborated her motive to harm McDaniel.
After the State and Johnson rested, a brief discussion of jury instructions ensued. Although Johnson's counsel did not object to a no-adverse-inference instruction, the record does not show that Johnson affirmatively consented to it. The jury was instructed: "The defendant has the right not to testify. This right is guaranteed by the federal and state constitutions. You should not draw any inference from the fact that defendant has not testified in this case." The jury was also instructed that "the arguments or other remarks of an attorney are not evidence."
The trial concluded with closing arguments. The State's closing argument and rebuttal was 28 transcript pages long. As relevant to this appeal, Johnson takes issue with the following five sentences:
What was [the] choice that the defendant made back on June 22nd when confronted with evidence against her? She chose to play dumb. She chose to lie over and over and over again. And at [the] end of that interview when Sergeant Donahue gave her a business card, [and] said, "Okay, if you change your mind and, you know, want to tell us the truth, want to tell us what really happened, here's the number you call." And you know, that defendant never ever made that choice.
Those sentences were delivered in the context of the prosecutor comparing T.S.'s and Johnson's interviews with police. The State argued that T.S. had chosen to be truthful, whereas Johnson had chosen to be untruthful.
The jury found Johnson guilty on both counts. The district court convicted Johnson of first-degree murder and sentenced her to life imprisonment without the possibility of release. This appeal follows.
ANALYSIS
I.
Johnson first argues that the district court erred by admitting into evidence her June 22 statement to police. This admission was unconstitutional, Johnson argues, for two reasons. First, she contends that the statement was involuntary.[2] See, e.g. , *745 State v. Zabawa , 787 N.W.2d 177, 182 (Minn. 2010) ("The Due Process Clause of the Fourteenth Amendment prohibits the admission into evidence of a statement that was not voluntarily given."). Second, she contends that her statement was obtained in violation of her right to counsel. See, e.g. , State v. Risk , 598 N.W.2d 642, 650 (Minn. 1999) (holding that, under the state constitution, "when an accused makes an ambiguous or equivocal statement that can reasonably be interpreted as a request for counsel, the police must stop all questioning at that time except for narrow questions designed to clarify the accused's intentions").
Because the errors alleged by Johnson are constitutional in nature, she does not have the burden to show that the errors were prejudicial. Rather, "the State bears the burden to prove the error was harmless beyond a reasonable doubt." State v. McAllister , 862 N.W.2d 49, 59 (Minn. 2015) ; see also State v. Hannon , 636 N.W.2d 796, 807 (Minn. 2001). For an error to be "harmless beyond a reasonable doubt," the State must show that "the verdict was 'surely unattributable' to the error." Hannon , 636 N.W.2d at 807 (quoting State v. McDonough , 631 N.W.2d 373, 384 (Minn. 2001) ).
In this case, we need not reach the merits of Johnson's constitutional arguments because the admission into evidence of Johnson's statement to police was harmless beyond a reasonable doubt. See State v. Sanders , 775 N.W.2d 883, 889 n.5 (Minn. 2009) ("When an alleged evidentiary error is harmless, an appellate court need not address the merits of the claimed error."). Assuming, without deciding, that Johnson's statement should not have been admitted, a thorough review of the record shows that Johnson's conviction was "surely unattributable" to the admission. McDonough , 631 N.W.2d at 384. Very strong independent evidence of Johnson's guilt was presented at trial.
The key witness was T.S., a cooperating eyewitness for the State, who was in the maroon SUV with Curtis and Johnson. T.S. testified that, before the shooting, she heard Johnson discuss McDaniel with Curtis, saw Johnson provide Curtis with a gun to kill McDaniel, and watched Johnson drive Curtis to and from the scene of the crime.
Much of T.S.'s testimony was corroborated by surveillance footage, phone records, text messages, and other witness testimony. Surveillance footage showed Johnson dropping Curtis off and picking him up near the scene of the crime. And the jailhouse recording of Johnson's telephone conversation with J.C. demonstrated that Johnson knew McDaniel had been killed. Further, the recording highlighted Johnson's motive to aid in the killing of the man who had previously shot her boyfriend.
Not only was the other evidence against Johnson very strong, her statement itself did not add a great deal to the case. The statement was not a confession; rather, Johnson gave her exculpatory version of the events and stuck to it. All of the facts that she admitted were easily proven with other evidence. This case is similar to Risk , in which we held that the admission of custodial statements was harmless because the statement "never amounted to a confession, and there was overwhelming independent evidence presented against appellant at trial." 598 N.W.2d at 650. For these reasons, we conclude that the guilty verdict was "surely unattributable" to the admission of Johnson's statement to police. McDonough , 631 N.W.2d at 384.
II.
Johnson next argues that, despite the absence of objection from her counsel, *746 it was plain error for the district court to give the jury a no-adverse-inference instruction without her consent, and that this error was prejudicial. See State v. Darris , 648 N.W.2d 232, 240 (Minn. 2002) ; see also Minn. Stat. § 611.11 (2016). The State concedes that the district court plainly erred, but argues that the error was not prejudicial.
"To obtain relief under the plain-error standard an appellant must show that: (1) there was an error; (2) the error was plain; and (3) the error affected substantial rights." State v. Campbell , 861 N.W.2d 95, 101 (Minn. 2015) ; see also Minn. R. Crim. P. 31.02. If plain error is established, "[t]he defendant bears a heavy burden of showing that substantial rights have been affected." Darris , 648 N.W.2d at 240. Substantial rights have been affected, and an error is thus prejudicial, if "there is a reasonable likelihood that giving the instruction in question had a significant effect on the jury verdict." State v. Gomez , 721 N.W.2d 871, 880 (Minn. 2006) (emphasis added).
After a thorough review of the record, we conclude that Johnson has failed to meet her "heavy burden" to show that it is reasonably likely that the no-adverse-inference instruction "had a significant effect on the jury verdict." Id. Nothing in the record shows that the instruction had such a significant effect. On plain error review, speculation as to prejudice is not sufficient. And, as we have already discussed, the evidence against Johnson was very strong. We are confident that, "[g]iven the totality of the evidence, it seems unlikely that the jury would have reached a different verdict" but for the no-adverse-inference instruction. Id. at 881.
III.
Finally, Johnson argues that the prosecutor committed misconduct during closing argument by "indirectly alluding" to her failure to testify. It is misconduct for a prosecutor to "allude to the defendant's failure to testify." State v. Whittaker , 568 N.W.2d 440, 451 (Minn. 1997). According to Johnson, this alleged misconduct was prejudicial and requires us to order a new trial.
Because Johnson failed to object at trial to the prosecutor's alleged misconduct, we review the issue under a modified plain-error standard. See State v. Peltier , 874 N.W.2d 792, 803 (Minn. 2016). Under this standard, the burden is first on the appellant "to demonstrate both that error occurred and that the error was plain." State v. Ramey , 721 N.W.2d 294, 302 (Minn. 2006). "[T]he burden ... then shift[s] to the state to demonstrate lack of prejudice." Id. Accordingly, if plain error is established, the State bears the burden of showing "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." Id. (citation omitted) (internal quotation marks omitted); see also State v. Parker , 901 N.W.2d 917, 926 (Minn. 2017).
Even assuming, without deciding, that the prosecutor's argument was plainly a forbidden allusion to Johnson's failure to testify, the State has demonstrated that it was not prejudicial. The alleged allusion-"that defendant never ever made that choice"-is one sentence from an extensive closing argument and rebuttal. See, e.g. , State v. Powers , 654 N.W.2d 667, 679 (Minn. 2003) (holding that a statement did not amount to misconduct because "[t]he improper statement was only two sentences in a closing argument that amounted to over 20 transcribed pages"); State v. Glaze , 452 N.W.2d 655, 662 (Minn. 1990) (holding that alleged prosecutorial misconduct in closing arguments did not require a new trial because "the remarks were isolated *747 and not representative of the closing argument when reviewed in its entirety").
Moreover, the jury had been properly instructed that the arguments of counsel were not evidence. See State v. Johnson , 616 N.W.2d 720, 728 (Minn. 2000) (concluding that alleged prosecutorial misconduct was not prejudicial in part because the jury was properly instructed that remarks made by the attorneys in closing were not evidence). Finally, as we have discussed, the evidence against Johnson-excluding that challenged on this appeal-was very strong. Accordingly, we conclude that the State has carried its burden to demonstrate lack of prejudice. See Ramey , 721 N.W.2d at 302.
CONCLUSION
For the foregoing reasons, we affirm Johnson's conviction.
Affirmed.

T.S. had entered into a plea bargain with the prosecution in connection with McDaniel's death. Her bargain was contingent on her testifying against Curtis and Johnson.

The State argues that Johnson forfeited her involuntariness argument by failing to argue it in the memorandum supporting her motion to suppress. But Johnson expressly raised the issue in her motion, and the district court ruled on the issue. Accordingly, it is properly before us.