STATE OF MINNESOTA

IN SUPREME COURT

A13-1624

Washington County                                          Dietzen, J.

State of Minnesota,

                 Respondent,

vs.                                                  Filed:  April 22, 2015
                                                     Office of Appellate Courts
Thomas James Fox,

                 Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Peter Orput, Washington County Attorney, Robin M. Wolpert, Assistant County Attorney, Stillwater, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Rachel F. Bond, Assistant Public Defender, Saint Paul, Minnesota, for appellant.
_____

S Y L L A B U S

1.      The district court did not err in denying appellant's motion to suppress the statements he made to police because appellant validly waived his *Miranda* rights under federal and state constitutional standards.

2.      The district court did not err when it declined to give appellant's proposed jury instruction on circumstantial evidence.

3.      The State presented sufficient evidence to support appellant's convictions.

1

4.      The claims in appellant's pro se supplemental brief are without merit.

Affirmed.

O P I N I O N

DIETZEN, Justice.

Appellant Thomas Fox was found guilty by a Washington County jury of first-degree premeditated murder and first-degree felony murder arising out of the December 2011 stabbing death of Lori Baker.  The district court entered judgment of conviction on both counts and sentenced Fox to life imprisonment without the possibility of release on the first-degree premeditated murder conviction.  On direct appeal, Fox argues that the district court erred because (1) the court denied his motion to suppress statements he made to police; (2) the court failed to give his proposed circumstantial evidence instruction to the jury; and (3) the evidence is insufficient to support his conviction of first-degree premeditated murder and first-degree felony murder.  Because we conclude that Fox's arguments lack merit, we affirm.

On the morning of December 28, 2011, Oakdale police responded to a call that the body of Lori Baker had been discovered in her apartment.  Upon their arrival, police found the victim's body on the bedroom floor, covered by a comforter "soaked with blood."  A Bureau of Criminal Apprehension (BCA) crime scene team processed Baker's apartment.  The BCA found blood spatter on the wall, what appeared to be laundry detergent throughout the bedroom, and empty containers of laundry detergent, rubbing alcohol, and a cleaning product on the bedroom floor.  Baker's silver Mazda hatchback was not found in the parking lot or garage.

Police learned that Fox was dating Baker and that Fox stayed in Baker's apartment some of the time. A woman who lived in the apartment directly below Baker's unit told police that she heard stomping noises and then repetitive, loud screaming that lasted about 10 minutes coming from Baker's apartment around 11:00 p.m. on December 27.

Additionally, Baker's debit card had been used in about 48 transactions in 15 different locations between the evening of December 27 and the afternoon of December 29. Police obtained surveillance videos, which show Fox and a vehicle matching the description of Baker's vehicle involved in several of those transactions.

Fox was located and arrested on December 29, 2011, on a Department of Corrections warrant unrelated to the Baker investigation. After his arrest, Fox was interviewed by police officers. Before officers had an opportunity to give Fox his *Miranda* rights, Fox volunteered, "Well this about, you know what I'm sayin' my girl's car man you know you can tell her she lived with me . . . ." Officers interrupted Fox, read him his rights, and Fox affirmed that he understood those rights. Fox then discussed his use of Baker's car, made statements regarding his use of Baker's credit card, and described his whereabouts since the crime. When officers informed Fox several minutes later that Baker was dead and that they suspected Fox was involved, Fox expressed disbelief and requested a lawyer. The officers did not ask any more questions.

The next day, Fox asked to speak with the police officers. At the beginning of the interview, Fox was reminded of his *Miranda* rights and agreed to waive them. During the interview, Fox informed the officers that he had contacted the Hennepin County Public Defender's Office earlier in the day, asking for representation, and was told that a

public defender could not represent him until he was formally charged. The police told Fox they could not advise him and asked him if he wanted to talk to a lawyer. Fox stated that he did not.

Unbeknownst to the police officers, two Washington County public defenders talked to Washington County jail staff and asked to meet with Fox about 2 hours before Fox's interview with police. Jail staff did not permit the public defenders to meet with Fox, but neither Fox nor the interviewing officers were aware of the public defenders' attempt to meet with Fox.

Fox was indicted April 19, 2012, on one count of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2014), and one count of first-degree intentional murder while committing or attempting to commit aggravated robbery, Minn. Stat. § 609.185(a)(3) (2014).

Before trial, Fox moved to suppress the statements he made to the police on December 29 and 30, on the ground that his *Miranda* waivers were not knowing or intelligent. The district court denied the motions to suppress.

At trial, the State presented the testimony of police officers regarding the discovery of Baker's body, the crime scene, the debit card transactions, the events leading up to Fox's arrest, and the recordings of Fox's two statements to police. BCA scientists testified that one blood sample from the comforter produced a DNA profile consistent with a mixture of DNA from two or more individuals. The predominant profile matched Fox's DNA profile. DNA profiles obtained from blood on Fox's boots, stocking cap, shirt, and jacket were consistent with a mixture of DNA from two or more individuals,

4

but Baker was excluded as a contributor to any of these mixtures. A carpet sample taken from Baker's bedroom contained compounds consistent with laundry detergent and the white powder found in Baker's bedroom was consistent with baking soda.

The medical examiner (ME) concluded that Baker died from exsanguination caused by 48 stab wounds to multiple parts of her body. The ME observed blunt force injuries to Baker's body, including contusions around her left eye, abrasions on the back of her head, and injuries consistent with someone placing a hand over her mouth. The ME determined that the weapon used was "probably" a "kitchen type knife." The ME estimated time of death as between 12:30 a.m. and 4:30 a.m.

J.N. testified that Fox contacted her from the Hennepin County jail. During the call, J.N. heard Fox say, "it was messed up what he did—what happened to Lori." Fox told J.N. that Lori was "just a woman that he had met that he was getting money from— just getting money from, somebody like a cash cow." T.W. testified that, sometime before Christmas, Fox told him he "was having problems with Lori," and that she gave him an "ultimatum." At the time, T.W. was living with T.G.

T.G. testified that, shortly before midnight on December 27, 2011, Fox came to the house and asked for T.W. Fox asked T.G. if she was "ready for him" because "he got rid of his girlfriend." Fox also stated that "[h]e f---ed up" and that "he did her in." T.W. stated that when Fox returned to T.G.'s house around 6:00-6:30 a.m., his "behavior was weird," and that Fox was sucking on his hand and smoking crack cocaine. Fox told T.W. that he had gotten the debit card from a woman in a "lick," meaning a theft or robbery; that he had the PIN for the card; and that he could withdraw money to pay T.W.

5

The State also presented the testimony of four informants who were in jail with Fox. The first witness testified Fox told him that "he had killed someone." The second witness testified Fox told him his girlfriend was already dead when he found her and later commented, "I can't believe I gutted my platinum piece." The third witness testified Fox admitted that his girlfriend had wanted him to leave, that he killed her, and that "he didn't mean to do in his platinum piece." The fourth witness testified Fox told him "he had left his ID there and she found out his real name. She wasn't happy about it. And they argued. Things happened."

After the close of evidence, the district court rejected Fox's proposed instruction on circumstantial evidence and instead gave the pattern jury instructions on circumstantial evidence and direct evidence from the Criminal Jury Instruction Guide. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.05 (5th ed. 2006). The jury found Fox guilty on both counts, and the district court entered judgment of conviction on both counts. The court sentenced Fox to the mandatory sentence of life imprisonment without the possibility of release on his first-degree premeditated murder conviction. This direct appeal followed.

I.

Fox argues that he did not knowingly or intelligently waive his Fifth Amendment right to remain silent, and therefore the district court erred in denying the motions to suppress his December 29 and December 30 statements to police. We review findings of fact related to an alleged *Miranda* waiver for clear error. *State v. Anderson*, 789 N.W.2d

227, 233 (Minn. 2010) (citing *State v. Burrell*, 697 N.W.2d 579, 591 (Minn. 2005)). But we review legal conclusions de novo. *Id.*

When a criminal suspect is subjected to custodial interrogation, the suspect must be informed of his right to remain silent and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966). A suspect may waive the Fifth Amendment privilege against self-incrimination and right to counsel, but only if the waiver is knowing, intelligent, and voluntary. *Id.* at 444. A waiver may be inferred from the totality of the circumstances. *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."); *State v. Merrill*, 274 N.W.2d 99, 106 (Minn. 1978) ("To determine whether a defendant's conduct implies an effective waiver, a court must look at the circumstances of the particular case."). But the State has the burden of proving a valid waiver. Ordinarily, the State satisfies its burden of proving a knowing, voluntary, and intelligent waiver of *Miranda* rights if it shows: (1) *Miranda* warnings were given, (2) the defendant stated that he or she understood those warnings, and (3) then the defendant gave a statement. *State v. Camacho*, 561 N.W.2d 160, 168 (Minn. 1997) (citing *State v. Linder*, 268 N.W.2d 734, 735 (Minn. 1978)).

## A.

Fox argues that he did not affirmatively waive his *Miranda* rights with respect to his December 29 statement, and therefore the district court erred in not suppressing it. Essentially, Fox makes two arguments. First, Fox argues that he did not waive his rights

or agree to speak with the officers. The State counters that Fox did not raise this argument to the district court, and therefore it is forfeited.

After his arrest, Fox was interviewed by officers. The officers initially stated that the interview pertained to a BCA case. Before the officers could give the *Miranda* warnings, Fox volunteered that the interview was about "my girl's car." The officers interrupted Fox, gave him the *Miranda* warnings, and Fox affirmatively stated that he understood his rights. Fox was then asked if he wished to speak to the police officers. Fox responded, "I mean what [inaudible] you know am I being charged or somthin'." The officer replied, "Okay, um the car you were in last night." Fox then said, "Right, it's my girl's car." Thereafter, Fox told the officers that Baker was his girlfriend, that he used Baker's car the last couple of days, that he had sex with another woman in the car, and that he ran from police because he had a warrant against him. After the officers told him that Baker was dead and that they were confident he had something to with it, Fox stated that he "did nothin' to that lady" and shortly thereafter invoked his right to an attorney.

Assuming without deciding that Fox's *Miranda* claim relating to the December 29 statement is properly before us, we reject it on the merits. It is true that police failed to obtain Fox's express waiver of his *Miranda* rights. But a waiver may be implied from the circumstances. *Berghuis*, 560 U.S. at 384; *Merrill*, 274 N.W.2d at 106.

Based upon the totality of the circumstances, we conclude that Fox impliedly waived his *Miranda* rights. The colloquy between Fox and the officer demonstrates that Fox was given the *Miranda* warnings, affirmatively stated that he understood his rights,

8

and proceeded to voluntarily participate in the interview. Fox was aware that he was going to be questioned on matters other than the Department of Corrections warrant on which he was arrested. Indeed, Fox introduced the subject of Baker's car and his relationship with Baker on his own. Thus, Fox impliedly waived his *Miranda* rights.

Second, Fox argues that, when he was arrested on an unrelated warrant, the police did not tell him that they wanted to question him regarding Baker's death, and therefore he did not knowingly and intelligently waive his *Miranda* rights. Fox relies on *State v. Beckman*, 354 N.W.2d 432 (Minn. 1984), for this argument.

The district court found that Fox was not totally unaware of why he was being interviewed and knew the subject of his interview included the circumstances of Baker's death. The record indicates that Fox volunteered information related to Baker and then the officers' questions focused on the circumstances relating to Baker's death.

We addressed a factually similar situation in *State v. Beckman*, where we considered, among other things, whether the failure to inform the defendant about the subject matter of the interrogation invalidated a *Miranda* waiver. *Id.* at 436. The defendant was asked to accompany the police to the station for the purpose of receiving a traffic ticket. *Id.* at 435. After he waived his *Miranda* rights, the defendant was questioned about a burglary and robbery. *Id.* We concluded that the defendant's waiver of his *Miranda* rights was valid, reasoning that the defendant was "not totally unaware" of the offenses about which police were going to question him because he was informed before waiving his rights that officers wanted to question him about matters other than the traffic ticket. *Id.* at 437. We cautioned police, however, to make sure that defendants

9

are informed of the crimes about which they will be questioned before they are asked to waive their *Miranda* rights. *Id.*

Subsequently, in *Colorado v. Spring*, 479 U.S. 564 (1987), the United States Supreme Court considered whether a defendant, who was questioned about firearms transactions that led to his arrest, validly waived his *Miranda* rights with respect to questioning about his role in a murder. *Id.* at 566-69. The defendant later confessed to the murder and was tried and convicted. *Id.* at 567-69. The Court held that a suspect's awareness of all the offenses about which he or she could be questioned in a custodial interview was not relevant to determining the validity of a decision to waive the Fifth Amendment privilege against self-incrimination. *Id.* at 577. The Court observed that the Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of his or her *Miranda* rights. *Id.* at 576. Additional information could affect the wisdom of a waiver, but not its voluntary and knowing nature. *Id.* at 577. The Court concluded that the failure to inform the defendant of the subject matter of an interrogation could not have affected his decision to waive his Fifth Amendment rights. *Id.*

We have not previously determined whether our decision in *Beckman* is good law in light of the United States Supreme Court's decision in *Spring*. It is not necessary for us to resolve that issue now because the record establishes that Fox was not totally unaware of the topics upon which he was going to be questioned. When police began the interview, Fox started discussing Baker's car before a single question was asked of him. The officer interrupted Fox to give him the *Miranda* warnings, after which the officers

10

returned the conversation to the subject of Baker's car, which segued into a discussion of Fox's activities on the night of December 27; his use of Baker's debit card; his failure to contact Baker for a day and a half; and ultimately, Baker's death. These facts confirm, as the district court determined, that Fox was "largely aware" of why he was being interviewed.[1] Because Fox was not totally unaware of the subject of the interrogation, Fox's waiver of his *Miranda* rights was valid under the more stringent standard from *Beckman*.

B.

Fox also contends that the district court erred in admitting his December 30 statement. Specifically, Fox argues that he invoked his Fifth Amendment right to counsel at the end of the December 29 interview, did not subsequently waive it, and therefore the district court erred in failing to suppress the December 30 statement. When a defendant is given *Miranda* warnings and invokes the right to counsel, any further responses to questioning may only be admitted upon the court finding that the defendant initiated

---

[1]    The district court did not state or indicate what burden of proof it applied to determine that Fox's waiver of his *Miranda* rights was "knowing, intelligent, and voluntary." Although it is not clear whether the district court applied the appropriate burden of proof, our precedent has made clear that even if the district court applied an incorrect standard, such an error is not reversible if the facts support the same result under the correct standard. *See State v. Holliday*, 745 N.W.2d 556, 563 n.3 (Minn. 2008) (concluding appellant's first-degree murder and attempted first-degree murder convictions were not reversible based on the district court's incorrect statement of the standard for premeditation because the evidence supported the court's finding of premeditation under the correct standard); *Kornberg v. Kornberg*, 542 N.W.2d 379, 387 n.3 (Minn. 1996) (concluding the district court's application of the incorrect standard of proof regarding fraud was not reversible error because no showing of fraud could be sustained under the correct standard of proof).

11

further discussion with the police and knowingly and intelligently waived the right he or she had previously invoked. *Smith v. Illinois*, 469 U.S. 91, 94-95 (1984) (per curiam) (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)).

It is undisputed that Fox invoked his right to counsel at the end of the December 29 interview and that police stopped questioning him. It is also undisputed that Fox then reinitiated contact with police. Fox does dispute, however, that he knowingly and intelligently waived his *Miranda* rights. Fox makes three arguments to support his contention that there was not a waiver. First, Fox argues that he was represented by a public defender, and therefore the interview should not have proceeded without a lawyer. Second, Fox argues that the police failed to inform him that public defenders had arrived at the jail and had requested to meet with him, and jail staff did not allow the meeting to occur. Without that information, Fox contends his waiver was invalid. Third, Fox argues that the public defender's office misinformed him that he was not entitled to be represented by the public defender until he was formally charged and that this misinformation invalidated the subsequent waiver of his right to counsel. We will discuss each argument separately.

1.

Fox first argues that he was represented by a public defender at the time of the December 30 interview, and implies that the interview should not have proceeded without his lawyer present. We have relied upon the Sixth Amendment to hold that "in-custody interrogation of a formally accused person who is represented by counsel should not proceed prior to notification of counsel or the presence of counsel," and that

12

statements obtained in violation of this rule are "subject to exclusion at trial." *State v. Lefthand*, 488 N.W.2d 799, 801-02 (Minn. 1992). We expressed our strong disapproval of in-custody interrogations if the defendant is represented by counsel and counsel is not provided with an opportunity to be present at the questioning. *Id.* at 801. Subsequently, in *State v. Parker*, we concluded that *Lefthand*, which relied on the Sixth Amendment right to counsel, was not applicable when the defendant had not been "formally accused" at the time of the disputed interview because he had not been arraigned. 585 N.W.2d 398, 405-06 (Minn. 1998).

The district court concluded that *Lefthand* was not applicable because at the time of the interview, Fox had not been formally charged and a public defender had not been appointed. We agree that our decision in *Lefthand* is not applicable in this case because Fox had not yet been formally charged, and therefore the statement is not subject to automatic exclusion—particularly here where there is no evidence that police knew that Fox was represented by a public defender, and therefore there is no evidence of police misconduct or manipulation. *See State v. Ford*, 539 N.W.2d 214, 224-25 (Minn. 1995) (explaining that our decision in *Lefthand* did not create an automatic exclusionary rule; instead whether the statement must be suppressed depends on "the egregiousness of the government's action in total").

2.

Second, Fox argues that the failure of the interviewing officers to inform him that public defenders had been at the jail trying to speak with him deprived him of information necessary to a knowing and intelligent decision to waive his *Miranda* rights.

13

In response, the State contends that Fox's argument is foreclosed by the United States Supreme Court's decision in *Moran v. Burbine*, 475 U.S. 412 (1986). In *Moran*, police obtained a *Miranda* waiver from an in-custody suspect without informing the suspect that a public defender, contacted by the suspect's sister without his knowledge, had telephoned the station stating that she would act as counsel for the suspect should he be questioned. *Id.* at 416-17. The United States Supreme Court reversed the United States Court of Appeals for the First Circuit, holding that the Fifth Amendment did not require exclusion of the defendant's statements. *Id.* at 428. The Court reasoned that the police failure to inform the defendant of an attorney's phone call did not deprive him of information essential to his ability to intelligently waive his Fifth Amendment rights to remain silent and to the presence of counsel. *Id.* at 422. "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* The level of police culpability, whether intentional or inadvertent, in failing to inform the defendant of the telephone call had no bearing on the validity of the defendant's waiver. *Id.* at 423.

Fox argues that *Moran* is distinguishable because the defendant in *Moran* did not invoke his right to counsel, and the defendant in that case was unaware of his sister's efforts to contact a public defender on his behalf. Fox also argues the defendant in *Moran* understood all of his rights and the potential consequences of waiving those rights.

But *Moran* is not distinguishable in any meaningful way. It is true that in *Moran* the Court stated, "the dissent never comes to grips with the crucial distinguishing feature

14

of this case—that [the defendant] at no point requested the presence of counsel." 475 U.S. at 423 n.1. But this statement was made in response to the dissent's claim that the analysis of the majority was inconsistent with *Edwards v. Arizona*, 451 U.S. 477 (1981), in which the court held that when a suspect has requested counsel, interrogation must cease regardless of any question of waiver unless the suspect himself initiates the conversation. *Id.* at 484-85. Thus, the defendant's failure to request counsel was crucial to the Court's conclusion that the *Edwards* rule did not apply in *Moran*, not to the Court's conclusion that police officers' failure to inform the defendant of an attorney's phone call did not deprive him of information essential to his ability to waive his Fifth Amendment right to the presence of counsel. More importantly, the *Edwards* rule is not applicable to Fox for a different reason: Fox reinitiated the conversation with police. *See Edwards*, 451 U.S. at 485-86 & n.9.

We conclude that the failure of the police to inform Fox that public defenders came to the jail to meet with him did not deprive him of information essential to his ability to waive his *Miranda* rights and therefore**,** pursuant to *Moran***,** did not invalidate his waiver. The fact that the public defenders came to the jail was unknown to Fox and had no bearing on his capacity to comprehend and knowingly waive his right to counsel. Moreover, there is no evidence of police misconduct or impropriety. It is undisputed that the interviewing officers were not aware of the efforts of public defenders to talk to Fox. Further, there is no evidence that Washington County jail staff deliberately failed to forward that information to the interviewing officers.

15

Fox next argues that even if the waiver of his *Miranda* rights was knowing and intelligent under the Fifth Amendment to the United States Constitution, it was not knowing or intelligent under Minn. Const. art. I, § 7 ("No person shall be held to answer for a criminal offense without due process of law, . . . nor be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property without due process of law."). Fox proposes that we depart from the U.S. Supreme Court's interpretation of the Fifth Amendment in *Moran* and adopt a more protective rule that holds a suspect's *Miranda* waiver is not knowing and intelligent when officers withhold information from the suspect about an attorney's attempt to contact him or her to render assistance.

The Minnesota Constitution may, under certain circumstances, provide more protection for individual rights than the United States Constitution. *Kahn v. Griffin*, 701 N.W.2d 815, 824 (Minn. 2005). We adhere, however, to "the general principle that favors uniformity with the federal constitution" and will not depart from federal precedent unless we have a "clear and strong conviction" that there is a "principled basis" for us to interpret the Minnesota Constitution as providing greater protection of individual rights. *Id.* at 828. When the text of our state constitution is identical or substantially similar to the federal constitution, as it is here, we look to the Minnesota Constitution for greater protection when: (1) the United States Supreme Court has made a "sharp or radical departure from its previous decisions" and "we discern no persuasive reason to follow such a departure;" (2) the Court has retrenched on Bill of Rights issues;

16

or (3) "federal precedent does not adequately protect our citizens' basic rights and liberties." *Id.*

The question of whether there is a principled basis to depart from *Moran* and adopt a more protective rule under Minn. Const. art. I, § 7, first requires clarification of what type of police conduct is encompassed by *Moran's* rule. *Moran* makes clear that its holding encompasses both inadvertent and intentional failures by police to inform a suspect about an attorney's efforts to contact the suspect. *See* 475 U.S. at 423 ("But whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights."). In this case, there is no evidence that the interviewing officers deliberately withheld information from Fox, or that jail staff deliberately failed to tell either the interviewing officers or Fox that public defenders tried to contact Fox. Moreover, we see no basis for imputing the knowledge of jail staff to the interviewing officers in this case.[2] Therefore the limited question that we need to address in this case is whether there is a principled basis to depart from *Moran* with respect to *inadvertent* failures by police to inform a suspect of an attorney's efforts to contact him or her.

---

[2]    Although we do impute knowledge amongst police officers who are from the same force or are involved in the same investigation in certain contexts, *see, e.g.*, *State v. Eling*, 355 N.W.2d 286, 290 (Minn. 1984) (permitting a probable cause finding to be based on the "collective knowledge" of the police department), Fox's argument would require us to impute knowledge among personnel from organizationally distinct entities— specifically the knowledge of jail staff from Ramsey County with investigators from the Oakdale Police Department and the BCA. There is no basis for us to do so in this case.

17

We conclude that there is no principled basis to depart from *Moran* and provide greater protection under Minn. Const. art. I, § 7, in this limited context. The U.S. Supreme Court's decision in *Moran*, with respect to the inadvertent failure of police to inform a suspect about an attorney's efforts to contact him, does not mark a sharp or radical departure from the Court's Fifth Amendment waiver precedent and did not retrench on a Bill of Rights issue. Moreover, the rule articulated in *Moran* does not, with respect to the inadvertent failure of police to inform, fail to adequately protect a basic right or liberty of Minnesotans. Because the facts of this case do not present the question of whether the Minnesota Constitution provides greater protection in the context of deliberate police withholding of information than the Fifth Amendment, as interpreted by the U.S. Supreme Court in *Moran*, we do not reach that issue.

3.

Third, Fox argues that the public defender's office misinformed him that he was not entitled to be represented by a public defender until he was formally charged, and that this misinformation invalidated his waiver.[3] The United States Supreme Court and our court have considered allegations of misinformation and police impropriety in several relevant cases. *See Duckworth v. Eagan*, 492 U.S. 195 (1989); *State v. Medrano*, 751 N.W.2d 102 (Minn. 2008); *State v. Bradford*, 618 N.W.2d 782 (Minn. 2000).

---

[3] The State responds that Fox failed to raise this argument below. "We do not ordinarily decide 'issues that are raised for the first time on appeal, even constitutional questions of criminal procedure.' " *State v. Anderson*, 733 N.W.2d 128, 134 (Minn. 2007) (quoting *State v. Allen*, 706 N.W.2d 40, 43 (Minn. 2005)). The State is correct that Fox did not raise this precise issue below. But the issue is germane to other arguments he has raised, and there is no prejudice to the State in addressing it now.

18

In *Duckworth*, the defendant, when first questioned by Indiana police in connection with a stabbing, made an exculpatory statement after being read *Miranda* warnings. 492 U.S. at 198. The warnings included a statement that, if the defendant could not afford a lawyer, one would be appointed to him "if and when you go to court." *Id.* Twenty-nine hours later, the defendant was interviewed again, signed a different waiver, admitted to the stabbing, and led officers to the site of the stabbing, where the officers discovered relevant physical evidence. *Id.* at 198-99. The defendant challenged the admissibility of his confession at the second interview, arguing that the first *Miranda* warnings were constitutionally defective because the phrase "if and when you go to court" implied that he was not entitled to a lawyer during interrogation unless the government filed charges and he went to court—misinformation that the second *Miranda* warnings failed to correct. *Id.* at 199-200. The United States Supreme Court held that the first warnings given to the defendant, in their totality, satisfied *Miranda*. The Court reasoned that the language "if and when you go to court" accurately described the procedure for appointment of counsel under Indiana law. *Id.* at 204. Second, *Miranda* does not require that attorneys be producible on call, but only requires that the defendant have a right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one. *Id.* The Court cautioned that a suspect's right to counsel cannot be linked to some future event *after* interrogation, but, viewed in their totality, the warnings in *Duckworth* did not suffer from such a defect. *Id.* at 204-05.

In *Medrano*, we held that a *Miranda* warning was not constitutionally flawed even though the suspect was informed that he would not "be able to talk to a lawyer until

19

tomorrow." 751 N.W.2d at 110. We noted that the police officer also informed the suspect that if he asked for a lawyer the interview would stop and the officers would not talk to him until he could consult a lawyer. *Id.* In light of these additional statements, we reasoned that the officer accurately informed the suspect of his *Miranda* rights by indicating he had the "right to an attorney *before* any police questioning," in accordance with *Duckworth*.[4] *Id.*

In *Bradford*, an in-custody suspect told interviewing officers, "I wanna talk to you but, I wanna have somebody present," and then asked when counsel would be appointed for him. 618 N.W.2d at 796. When he was told an attorney would be provided within 36 hours of his arrest if he was formally charged, the suspect stated, "Ok, well, I'm gonna tell you what happened," answered "yes" when asked if he wanted to tell his side of the story "without an attorney here," and then proceeded to give a statement. *Id.* We held

---

[4]     Fox points out that Minnesota law permits a criminal suspect to, under certain circumstances, obtain appointed counsel prior to his or her first appearance. *See* Minn. Stat. § 611.18 (2014) ("Prior to any court appearance, a public defender *may* represent a person accused of violating the law, who appears to be financially unable to obtain counsel . . . ."). But whether Fox could lawfully have been represented by a public defender before formal charges were brought does not directly bear on the question of whether Fox understood his Fifth Amendment right to counsel. *See Medrano*, 751 N.W.2d at 111 (explaining that the validity of the *Miranda* warning does not turn on the accuracy of the warning under applicable state law; rather, the suspect's right to counsel may not be linked to a future time after the interrogation is completed). Even if Fox was misinformed about when he would be able to secure representation by the public defender, the record establishes that Fox clearly understood that he did not need to answer questions until he had counsel, and the police officers who questioned Fox made sure that he was choosing to talk without an attorney present.

that the district court "properly concluded that Bradford invoked his right to counsel, but then waived that right after reinitiating a conversation with the police." *Id.*

We conclude that a defendant's understanding that he was not entitled to the assistance of appointed counsel until he was formally charged did not invalidate the waiver of his previously invoked Fifth Amendment right to counsel. The *Miranda* warnings given to Fox at the beginning of the second interview were valid and satisfied *Miranda*. Specifically, Fox was advised that he had the right to have a "lawyer present with [him] while [he was] being questioned," that if he could not afford a lawyer "one will be appointed ta' represent [him] *before* any questioning if [he] wish[ed]," (emphasis added), and that Fox could "decide at any time" to "[n]ot answer any questions or make any statements." Fox waived his *Miranda* rights and then reinitiated the "conversation with the police," like in *Bradford*. After a little more than a page of discussion in the transcript of the interview, Fox told police that he had spoken to a public defender earlier in the day and that the public defender informed Fox that the only way he could receive the assistance of a public defender was if he was charged with a crime. The officers responded,

> [Officer]: And just [to] be clear, you decided that you didn't wanna have a lawyer present when you're doing this so, right?
> [Fox]: At [this] time, yes sir.
> [Officer]: Yes, okay.
> [Fox]: Yeah.

Thereafter, the officers clarified that they did not say anything about Fox needing to be charged to have a lawyer and that they had informed him of his rights and had explained them. A few lines later the officers again confirmed that Fox was "not asking for a

21

lawyer right now?" and Fox responded, "No sir I'm not." Like the defendant in *Bradford*, Fox then affirmed that he wanted to tell his side of the story, even without an attorney present, stating that he would "rather go and get this off my chest and deal [with] it now . . . and get it over with." There is no evidence in the transcript that the police officers improperly suggested that Fox had to speak with them in order to receive the assistance of appointed counsel. Instead, the record indicates that, like the defendant in *Bradford*, Fox received valid *Miranda* warnings, he understood his rights, and he voluntarily waived those rights.

In sum, the district court's conclusion that Fox's waiver of his Fifth Amendment right to counsel was voluntary, knowing, and intelligent is supported by the record. The public defender's efforts to speak with Fox before the interview occurred outside of Fox's presence and were entirely unknown to him. Consequently, it has no bearing on his capacity to understand and waive his constitutional rights. The Constitution does not require police to supply a suspect with all information relevant to a decision. All the Constitution requires is that the waiver be uncoerced, that the suspect understand that he or she has the right to remain silent and the right to counsel, and that the suspect understand that any statements made could be used against him or her. There is no evidence here that the police officers engaged in any misconduct or impropriety. When the officers became aware that Fox had spoken to the public defender's office, and that Fox was potentially confused regarding his right to counsel, the officers clarified that they did not advise him that he could not have appointed counsel until formally charged,

22

asked him twice whether he wanted counsel, and confirmed that he did not. On these facts, we hold that Fox validly waived his *Miranda* rights.

## II.

Fox argues that the district court erred by declining to give his requested jury instruction on circumstantial evidence. Specifically, Fox requested that the district court give the following jury instruction: "In order to return a verdict of guilty on the basis of circumstantial evidence, all circumstances proved must be consistent with that conclusion and inconsistent with any other rational conclusion." The district court rejected Fox's proposed jury instruction on the basis that it was confusing and not required by existing law. The court also expressed concern that such an instruction would effectively require juries to complete special verdict forms identifying how direct versus circumstantial evidence contributed to the verdict. Instead, the court gave the pattern jury instructions on circumstantial evidence and direct evidence:

> [I]t is necessary for the State to prove all of the material allegations [in the Indictment] beyond a reasonable doubt in order to establish the [D]efendant's guilt. . . .
>
> A fact may be proven by either direct or circumstantial evidence, or by both. The law does not prefer one form of evidence over the other.
>
> . . . A fact is proven by circumstantial evidence when its existence can be reasonably inferred from other facts proven in the case.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.05 (5th ed. 2006).

We review a district court's refusal to give a requested jury instruction for abuse of discretion. *State v. Scruggs*, 822 N.W.2d 631, 640 (Minn. 2012) (citing *State v.*

23

*Palubicki*, 700 N.W.2d 476, 487 (Minn. 2005)). A district court has "considerable latitude" in selecting jury instructions and in selecting language for jury instructions. *State v. Anderson*, 789 N.W.2d 227, 239 (Minn. 2010). When the instructions read as a whole correctly state the law in language understandable to the jury, there is no reversible error. *Id.* But the district court errs when it gives instructions that confuse, mislead, or materially misstate the law. *Scruggs*, 822 N.W.2d at 642.

In *State v. Turnipseed*, 297 N.W.2d 308, 312 (Minn. 1980), we stated that a district court's jury instruction in a criminal case involving circumstantial evidence does not need to state that the circumstances proved must be "consistent with [the] conclusion [of guilt] and inconsistent with any other rational conclusion." We noted that such language is not a "mandatory" instruction in circumstantial evidence cases. *Id.* Moreover, we explained that tests for sufficiency of the evidence are conceptually distinct from jury instructions and "not every sufficiency of the evidence test should be read to the jury." *Id.* We have followed *Turnipseed* in two relevant cases. *See, e.g.*, *State v. Stein*, 776 N.W.2d 709, 723 (Minn. 2010) ("Although we eventually abandoned the special jury instruction, *State v. Turnipseed*, 297 N.W.2d 308, 313 (Minn. 1980), we retained the traditional rational hypothesis review standard.") (Meyer, J., concurring); *State v. Jones*, 516 N.W.2d 545, 548 n.4 (Minn. 1994) (holding that *Turnipseed* controlled and that the district court did not err in failing to give a rational hypothesis jury instruction regarding circumstantial evidence).

Recently we discussed the circumstantial evidence standard of review for sufficiency challenges in *State v. Andersen*, 784 N.W.2d 320 (Minn. 2010), in which the

24

concurrence urged the court to adopt a rule requiring district courts to provide a rational-hypothesis instruction to the jury in circumstantial evidence cases. *Id.* at 337-40 (Meyer, J., concurring); *see also State v. Tscheu*, 758 N.W.2d 849, 871 (Minn. 2008) (Meyer, J., concurring). We did not adopt the rule advocated by the concurrence in *Andersen*, nor have we overruled *Turnipseed*. Consequently, the district court did not materially misstate existing law by giving the pattern jury instructions on circumstantial evidence and direct evidence and not a "rational hypothesis" instruction, like that proposed by Fox. We therefore hold that the district court did not abuse its discretion when it declined to give Fox's proposed "rational hypothesis" jury instruction on circumstantial evidence.

## III.

Fox argues that the State did not present sufficient evidence to support his convictions of (1) first-degree felony murder, or (2) first-degree premeditated murder. For the reasons that follow, we conclude the State presented sufficient evidence to support Fox's convictions.

## A.

Fox argues that the evidence is not sufficient to support the jury verdict that Fox formed the intent to commit the underlying felony of aggravated robbery either before or during Baker's murder. Specifically, Fox argues the evidence does not exclude the rational hypothesis that Fox's taking of the debit card was an impulsive afterthought following the killing.

When evaluating whether the evidence is sufficient, we carefully examine the record to determine whether the facts and the legitimate inferences drawn from them

25

would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted. *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010); *Davis v. State*, 595 N.W.2d 520, 525 (Minn. 1999). We view the evidence presented in the light most favorable to the verdict, and assume that the fact-finder disbelieved any evidence that conflicted with the verdict. *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011); *State v. Leake*, 699 N.W.2d 312, 319 (Minn. 2005). The verdict will not be overturned if the fact-finder, upon application of the presumption of innocence and the State's burden of proving an offense beyond a reasonable doubt, could reasonably have found the defendant guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

When a conviction is based on circumstantial evidence, we use a two-step test to evaluate the sufficiency of the evidence. *State v. Andersen*, 784 N.W.2d 320, 329-30 (Minn. 2010). First, we identify the circumstances proved and, in doing so, we defer to the fact-finder's acceptance of the proof of these circumstances and the fact-finder's rejection of evidence in the record that conflicts with the circumstances proved by the State. *Id*. at 329. Second, we examine independently the reasonable inferences that might be drawn from the circumstances proved. *Id*. We give no deference to the fact-finder's choice between reasonable inferences. *Id*. at 329-30. To sustain a conviction based on circumstantial evidence, the reasonable inferences that can be drawn from the circumstances proved as a whole must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt. *Id*. at 332 (citing *State v. Curtis*, 295 N.W.2d 253, 258 (Minn. 1980)). We will not overturn a

26

conviction based on circumstantial evidence on the basis of mere conjecture. *State v. Lahue*, 585 N.W.2d 785, 789 (Minn. 1998).

First-degree felony murder under Minn. Stat. § 609.185(a)(3), requires proof that the defendant "cause[d] the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit" one of several enumerated felonies, including aggravated robbery. "[T]he act that constitutes the underlying felony may occur before, during, or after the killing," *State v. Darris*, 648 N.W.2d 232, 239 (Minn. 2002) (citing *State v. Harris*, 589 N.W.2d 782, 792 (Minn. 1999)), but "[a] conviction for felony murder will be upheld only when the killing and the felony are part of 'one continuous transaction,' " *id.* at 237 (quoting *Kochevar v. State*, 281 N.W.2d 680, 686 (Minn. 1979)). For there to be one continuous transaction, there must be evidence that the defendant formed the intent to commit the underlying felony *before or during* the act resulting in death. *Id.* at 239.

In this case, the circumstances proved are that Fox depended on Baker for money, that Fox and Baker had experienced relationship problems prior to the murder, and that Baker gave Fox an ultimatum to move out of the apartment. Fox admitted that he did not have the PIN to Baker's debit card prior to the night Baker was killed. Several of Baker's injuries were not life threatening. Fox took Baker's debit card, leaving the wallet and the rest of her cards in her apartment. Using the PIN to Baker's debit card, Fox used the debit card repeatedly over the course of the two days following Baker's death.

From these circumstances, the only reasonable inference is that Fox formed the intent to rob Baker before or during the killing and that during the killing he inflicted

27

non-life-threatening injuries that forced Baker to disclose the PIN to her debit card. Unlike in *Darris*, 648 N.W.2d at 237-40, it is not rational to infer that Fox took the debit card as an impulsive afterthought because once Baker was dead, there was no way for her to disclose the PIN to her debit card. We therefore conclude that the State presented sufficient evidence to support Fox's conviction of first-degree felony murder under Minn. Stat. § 609.185(a)(3).

B.

Fox also argues that there was not sufficient evidence to prove that the killing was premeditated. A person who "causes the death of a human being with premeditation and with intent to effect the death of the person" is guilty of first-degree murder. Minn. Stat. § 609.185(a)(1). Premeditation means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2014).

Premeditation is "generally proven through circumstantial evidence" and "often inferred from the totality of circumstances surrounding the killing." *State v. Hughes*, 749 N.W.2d 307, 312 (Minn. 2008) (citation omitted) (internal quotation marks omitted). We consider three categories of evidence relevant to an inference of premeditation: planning activity, motive, and the nature of the killing. *State v. Moore*, 846 N.W.2d 83, 89 (Minn. 2014).

We first turn to planning activity. Planning activity relates to "facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing." *Hughes*, 749 N.W.2d at 313 (citation omitted) (internal quotation marks omitted). We have found that planning activity includes

28

procuring the murder weapon from one part of the house and bringing the weapon to the victim's location. *See, e.g.*, *Moore*, 846 N.W.2d at 89; *State v. Merrill*, 274 N.W.2d 99, 103-04 (Minn. 1978). We have also established that a defendant's actions both before and after the killing are relevant to planning activity, including a defendant's "cool, calm demeanor" in attempting to avoid detection and destroy evidence. *See, e.g.*, *State v. Hurd*, 819 N.W.2d 591, 600 (Minn. 2012); *see also State v. Leake*, 699 N.W.2d 312, 321 (Minn. 2005).

The circumstantial evidence of premeditation based on planning activity is significant. A few hours before the killing, Fox retrieved a duffel bag containing clothes from T.G.'s house. The police found a drawer containing knives slightly ajar in Baker's kitchen. Baker's body was found stabbed 48 times in her bedroom. Blood spatter from the stabbing was confined to the bedroom. Baker's wounds are consistent with wounds inflicted by a kitchen knife. Although the specific murder weapon was not recovered, one can reasonably infer that the knife Fox used to kill Baker came from her kitchen, not somewhere else. The evidence that Fox secured a change of clothes and then used a knife that is typically found in a kitchen to stab Baker to death in her bedroom was sufficient to establish planning activity. *See Moore*, 846 N.W.2d at 89.

Additionally, Fox attempted to destroy evidence by pouring cleaning products over Baker's body and her bedroom. Fox took Baker's debit card and used it repeatedly after the killing, at times involving other people to make withdrawals or purchases with the card. Shortly before he was arrested, Fox purchased a bus ticket to Milwaukee under an assumed name, "Tim Fox." Collectively, Fox's behavior before and after the murder

29

shows that he had the presence of mind to take multiple actions aimed at destroying evidence and evading detection. In recent cases, we have held that similar efforts on the part of the defendant supported the jury's finding of premeditation. *See, e.g.*, *Hurd*, 819 N.W.2d at 600; *Leake*, 699 N.W.2d at 321. When viewed as a whole, the circumstances proved relating to planning activity support a reasonable inference of premeditation and are inconsistent with any rational hypothesis other than that the killing was premeditated.

We next address the nature of the killing. While a "series of shots or blows" does not itself support a finding of premeditation, numerous blows can indicate premeditation when supported by additional evidence, such as evidence of a "long and severe attack." *State v. Cooper*, 561 N.W.2d 175, 180 (Minn. 1997) (citing *State v. Richardson*, 393 N.W.2d 657, 664 (Minn. 1986)). Moreover, evidence that a defendant struck additional blows after the victim was already incapacitated supports a finding of premeditation. *See State v. Palmer*, 803 N.W.2d 727, 736-37 (Minn. 2011) (reasoning evidence showing that the defendant "stood over [the victim] and finished him off," including the downward trajectories of some of the bullet paths, supported the jury's finding of premeditation); *State v. Clark*, 739 N.W.2d 412, 423 (Minn. 2007) (reasoning evidence showing that the fatal second wound was inflicted while victim was lying on the floor supported the jury's finding of premeditation).

The circumstantial evidence of premeditation based on the nature of the killing is significant. Baker was stabbed 48 times, with several of these wounds to "vital areas" of her body, including her neck, chest, and back. Baker was stabbed at least once while crouched or prone on the ground, indicated by a deep back wound inflicted at a

30

downward angle and blood spatter less than 2 feet above the floor, in an upward direction. The medical examiner testified that the varied depth and placement of the wounds was likely due to the fact that Baker was moving and trying to protect herself during the attack. Baker also had blunt force injuries to her eye and back of her head, as well as defensive wounds to her hand and arm. A downstairs neighbor heard 10 minutes of screaming coming from Baker's apartment on the night of the killing. Injuries to the inside of Baker's mouth are consistent with Baker's mouth being covered, supporting the reasonable inference that the attack lasted even longer than 10 minutes because at some point Baker was not able to scream.

Fox contends that the "varied and haphazard" location of Baker's wounds, the lack of evidence that the attack was "aimed at or struck vital bodily areas," and the lack of eyewitness or medical evidence that the attack was prolonged make it impossible to exclude a rational hypothesis that Fox's killing of Baker was rash and impulsive. Based upon the circumstances proved, we conclude the only reasonable inference is that Baker died after a severe and prolonged attack. The medical examiner testified that the varied depth and placement of the wounds was likely due to the fact that Baker was moving and trying to protect herself during the attack. The 10 minutes of screaming from Baker's apartment, the evidence that Baker's mouth was covered, the 48 stab wounds, and the evidence that Baker was stabbed after she was already helpless on the floor, support the conclusion that Fox had sufficient time to deliberate before he decided to kill Baker.

Lastly, we turn to motive. Fox argues that the State did not provide evidence of motive. Motive "may be inferred from the defendant's prior relationship and conduct

with the victim," including " 'plans or desires of the defendant which would be facilitated by the death of the victim, and prior conduct of the victim known to have angered the defendant.' " *Hughes*, 749 N.W.2d at 314 (quoting *Moore*, 481 N.W.2d at 361). Although proof of motive is not necessary to find premeditation, *State v. Griese*, 565 N.W.2d 419, 429 (Minn. 1997), evidence that Fox had a motive to kill Baker may be used to support a finding of premeditation. The circumstances proved are that Baker gave Fox money and a place to stay and the relationship between Baker and Fox had deteriorated to the point that Baker gave Fox an ultimatum to leave the apartment. The jury could reasonably infer that Fox's motive for killing Baker was to prevent her from cutting him off from her money. Notably, after Baker was killed, Fox used Baker's debit card to make purchases and withdraw money from her account. Fox counters that his dependence on Baker for money, a place to sleep, and use of her car, are consistent with a rational hypothesis that Fox had *no* motive to kill Baker. But this hypothesis ignores evidence that Baker was no longer going to take care of him.

In sum, the evidence of Fox's planning activity, the nature of the killing, and motive all support the jury's finding of premeditation. We therefore hold that the State presented sufficient evidence to support Fox's first-degree premeditated murder conviction.

32

IV.

We have also reviewed the claims in Fox's *pro se* supplemental brief relating to his conviction and sentence.[5] None of these claims has merit. Additionally, Fox raises claims relating to the conditions of his confinement. These claims are not addressed here because they are more appropriately raised in a petition for habeas corpus relief or in a civil action under 42 U.S.C. § 1983 (2012). *See Kelsey v. State*, 283 N.W.2d 892, 895 (Minn. 1979) (stating that habeas corpus may be used to challenge prison conditions as cruel and unusual punishment); *see also In re J.A.G.*, 446 N.E.2d 868, 870 (Ill. Ct. App. 1983) (holding that delinquent minor could not challenge the conditions of his confinement on direct appeal from his commitment because the record would not be sufficiently developed on this issue to permit review).

Affirmed.

---

[5] In his *pro se* supplemental brief, Fox argues that his statements to police were unconstitutionally obtained; that the State committed multiple instances of prosecutorial misconduct; that his sentence of life in prison without the possibility of release is in error; that the district court failed to instruct the jury as to a lesser-included offense; that the date of the offense on the indictment is incorrect; that the indictment was not supported by probable cause; that prosecutorial misconduct unduly tainted the grand jury proceedings; and that he received ineffective assistance of trial counsel.