*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0991**

State of Minnesota,
Respondent,

vs.

David Charles Adams,
Appellant.

**Filed May 9, 2016
Affirmed
Johnson, Judge**

Becker County District Court
File Nos. 03-CR-14-939, 03-CR-14-133

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Gretchen D. Thilmony, Becker County Attorney, Tammy L. Merkins, Assistant County Attorney, Detroit Lakes, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Amy Lawler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schellhas, Presiding Judge; Worke, Judge; and Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**JOHNSON**, Judge

David Charles Adams pleaded guilty to second-degree criminal sexual conduct after he admitted that he engaged in sexual conduct toward a minor, which caused her to give

birth to a child. The district court sentenced Adams to 150 months of imprisonment, with 436 days of jail credit based on the date that Adams confessed to a law-enforcement officer. Adams argues that the district court should have awarded him 865 days of jail credit based on the date on which the girl gave birth. We affirm.

## FACTS

On October 30, 2013, the White Earth Police Department received a report that a girl, A.C., might be a victim of criminal sexual conduct. On November 5, 2013, a police investigator interviewed A.C. According to the complaint, A.C. informed the investigator that Adams had "had sexual intercourse with her on multiple occasions," beginning on December 31, 2010, when she was 12 years old, and continuing until at least July 2012. During that time period, Adams was between 23 and 25 years old. A.C. also informed the investigator that she had given birth to a child in July 2012.

At the time of the investigator's interview of A.C., Adams was in custody on an unrelated charge. On December 16, 2013, the police investigator obtained a DNA sample from Adams. At approximately the same time, the police investigator obtained a DNA sample from A.C.'s child.

On January 8, 2014, Adams was released from detention. On the day of his release, an investigator questioned him at the county jail about A.C. Adams admitted to engaging in sexual conduct toward A.C. and stated that he may be the biological father of A.C.'s child. On January 28, 2014, law enforcement received the results of DNA tests, which confirmed that Adams is the biological father of A.C.'s child.

2

On May 7, 2014, the state charged Adams with one count of first-degree criminal sexual conduct, in violation of Minn. Stat. § 609.342, subd. 1(a) (2010), and one count of third-degree criminal sexual conduct, in violation of Minn. Stat. § 609.344, subd. 1(b) (2010). On September 23, 2014, the state amended the complaint by adding one count of second-degree criminal sexual conduct, in violation of Minn. Stat. § 609.343, subd. 1(h)(iii) (2010). On that same day, Adams pleaded guilty to the second-degree charge, and the state dismissed the other two charges.

In early November 2014, while awaiting sentencing, Adams sent a *pro se* letter to the district court in which he stated that he should be given jail credit dating back to when the child was conceived in November 2011. In late November 2014, the state filed a memorandum of law in which it argued that jail credit should be based on January 8, 2014, the date on which Adams confessed to a police investigator. In December 2014, Adams, through his appointed counsel, filed a memorandum of law in which he argued that jail credit should be based on a date before January 8, 2014, without specifying any particular date.

At a March 19, 2015 sentencing hearing, Adams argued that he is entitled to 865 days of jail credit on the ground that the state "would have or should have" had probable cause to charge him when A.C. gave birth on July 25, 2012. The district court awarded him 436 days of jail credit based on the time he spent in custody since January 8, 2014, the date of his confession. Adams appeals.

3

**D E C I S I O N**

Adams argues that the district court erred by awarding him only 436 days of jail credit based on the date of his confession rather than 865 days of jail credit based on the date on which A.C. gave birth.

"A criminal defendant is entitled to jail credit for time spent in custody 'in connection with the offense or behavior incident being sentenced.'" *State v. Clarkin*, 817 N.W.2d 678, 687 (Minn. 2012) (quoting Minn. R. Crim. P. 27.03, subd. 4(B)). A defendant also is entitled to credit for time spent in custody on another offense before being charged with the offense of conviction. *State v. Folley*, 438 N.W.2d 372, 374 (Minn. 1989). In such a case, a defendant is entitled to credit as of the date when

> (1) the State has completed its investigation in a manner that does not suggest manipulation by the State, and (2) the State has probable cause and sufficient evidence to prosecute its case against the defendant with a reasonable likelihood of actually convicting the defendant of the offense for which he is charged.

*Clarkin*, 817 N.W.2d at 689. "The defendant has the burden of establishing that he is entitled to jail credit for any specific period of time." *Id.* at 687. Whether a defendant is entitled to custody credit is "a mixed question of fact and law." *Id.* (quotation omitted). This court applies a clear-error standard of review to a district court's findings of fact relevant to custody credit and a *de novo* standard of review to a district court's legal analysis. *Id.*

Adam's argument is concerned solely with the first part of the *Clarkin* test, which is concerned primarily with when "the State has completed its investigation." *See id.* at 689. The district court, by awarding Adams 436 days of credit, impliedly found that the

4

state had completed its investigation on January 8, 2014, the date on which Adams admitted to a police investigator that he had engaged in sexual conduct toward A.C. That implied finding is somewhat generous toward Adams. The police department had begun the DNA-testing process in December 2013, before Adams's confession, and did not receive the results of the DNA testing until January 28, 2014. The district court's implied finding, however, is consistent with the state's argument to the district court.

Adams's argument is focused not so much on when the state *actually* completed its investigation but, rather, on when the state *could have or should have* completed its investigation. Adams bases his argument on the qualifier in the first part of the two-part *Clarkin* test, which is highlighted here: when "the State has completed its investigation *in a manner that does not suggest manipulation by the State*." *Clarkin*, 817 N.W.2d at 689 (emphasis added). The qualifier derives from *Folley*, in which the supreme court stated that "'the total amount of time a defendant is incarcerated should not turn on matters that are subject to manipulation by the prosecutor.'" *Id.* at 688 (quoting *Folley*, 438 N.W.2d at 374). Adams contends that a broad view of the facts that led to the charges against him suggest manipulation by the state, for the following reasons:

> Here, a 14-year-old girl gave birth on July 25, 2012, in the presence of a social worker, to a baby that was placed in foster care before the end of that year. A 14-year-old girl is below the age of consent, and her pregnancy would certainly be subject to an investigation under Minn. Stat. § 626.556. State social service agencies are also involved in the supervision of the living arrangements of underage mothers, under Minn. Stat. § 256J.14. And under Minn. Stat. § 257.33, a hospital must report the birth of a child to a minor mother within three days to the county social services agency, which must work with the mother to develop a plan. This plan "must

5

consider . . . the involvement of the father of the minor's child including steps being taken to establish paternity, if appropriate." Minn. Stat. § 257.33, subd. 2(a)(3). If a minor mother refuses to make or follow through with the plan, "the county social services agency may file a petition under section 260C.141 seeking an order for protective supervision." Minn. Stat. § 257.33, subd. 2(c). When a child is placed in foster care, under Minn. Stat. § 260C.150, subd. 3, the responsible social service agency must "make diligent efforts to identify and locate" the child's father.

The fact that here the infant was placed in foster care indicates a certain level of government involvement, and the infant's DNA was irrefutable proof of Adams' sexual relationship with the 14-year-old A.C. Neither A.C. nor Adams have ever denied the existence of their relationship, but the birth of their child in 2012 provides a clear date on which proof was made available to the state. Their relationship continued after the child was born, and around September of 2012 A.C. ran away from home, was found with Adams, and was placed in a juvenile detention center. The state was then further involved when it placed the infant in foster care. The state does not claim that A.C. or Adams ever denied the infant's paternity, or that the infant was placed into foster care without any identification of his father. Yet the state did nothing to bring its investigation of Adams to a close until after Adams was released from prison. Despite having all of the necessary evidence of his offense, and despite knowing the whereabouts of Adams while he was on probation and then incarcerated, the state waited until after his release from prison to meet with him and obtain a confession.

Adams contends that, in light of the various laws implicated by A.C.'s giving birth, he "need not allege or prove that there was any intentional prosecutorial manipulation." Rather, he contends that "the record is clear that this is a matter that was inherently subject to manipulation."

Adams's argument fails for both legal and factual reasons. First, as an initial matter, it is necessary to consider whether the knowledge and actions of the various public-sector

6

employees implicated by Adams's argument may be deemed to be the knowledge and actions of the state. We are disinclined "to impute knowledge among personnel from organizationally distinct entities." *State v. Fox*, 868 N.W.2d 206, 218 n.2 (Minn. 2015) (declining to impute knowledge among staff of county jail, city police department, and state bureau of criminal apprehension for purposes of waiver of *Miranda* rights). In this particular context, we interpret the phrase "the State," as used in *Clarkin*, to refer to the governmental entity that is responsible for prosecuting the case against a defendant. We do so because the supreme court stated in *Clarkin* that "the prosecutor is the sole entity in the criminal justice system with the authority to make charging decisions." 817 N.W.2d at 689 (citing *Johnson v. State*, 641 N.W.2d 912, 917 (Minn. 2002)). The supreme court's caselaw on custody credit is consistent with that principle because it typically refers with specificity to "the prosecutor" when describing actions taken on behalf of the state before a defendant is charged. *See, e.g.*, *Clarkin*, 817 N.W.2d at 688-89; *Folley*, 438 N.W.2d at 374-75. If a court were to consider the knowledge and actions (or inaction) of any person employed by the State of Minnesota or one of its political subdivisions (or a tribal government), the court's analysis would be inconsistent with the principle that only a prosecutor represents the state in a criminal proceeding. Thus, in determining when "the State has completed its investigation in a manner that does not suggest manipulation by the State," *Clarkin*, 817 N.W.2d at 689, we look to the knowledge, actions, and inaction of the governmental entity that assumed responsibility for prosecuting the defendant for the offense of which he was convicted. Viewed through that lens, none of the events in this case preceding the October 2013 report of a possible crime are relevant because there is no

7

indication in the record that the county attorney's office actually was aware of any of that information.

Second, even if Adams were permitted to impute to the state the knowledge, actions, and inaction of the various public-sector entities and employees implicated by his argument, he has not established facts that "suggest manipulation by the State." *See id.* at 689. Adams's argument that his custody "was inherently subject to manipulation" is based on the supreme court's statement in *Folley* that "the total amount of time a defendant is incarcerated should not turn on matters that are subject to manipulation by the prosecutor." 438 N.W.2d at 374. But that statement does not mean that a district court must presume manipulation as a matter of law if there is any possibility that the state could have manipulated a defendant's time in custody. Rather, the manner in which the supreme court has applied the principle of *Folley* indicates that a district court should infer manipulation as a matter of fact if the circumstances suggest that the state actually has manipulated a defendant's time in custody, keeping in mind that "[a]ny uncertainty . . . must be resolved against the prosecutor." *See Folley*, 438 N.W.2d at 373-75 (concluding that prosecutor manipulated process by intentionally waiting to charge defendant for criminal sexual conduct until he posted bail on DWI charge); *see also Clarkin*, 817 N.W.2d at 689 (concluding that prosecutor did not manipulate process in light of absence of delay and investigation involving multiple police departments). The supreme court has not held that a prosecutor engages in manipulation by not commencing an investigation that conceivably could have been commenced. The caselaw states that a prosecutor engages in manipulation only if the prosecutor commences an investigation and refrains from completing the

8

investigation and charging the defendant. *See Clarkin*, 817 N.W.2d at 689; *Folley*, 438 N.W.2d at 373-75.

Third, even if Adams were to overcome the first and second hurdles described above, we would not conclude that the district court erred in light of the nature of the factual record. The facts on which Adams's argument is based are contained only in a victim-impact statement, which was submitted by a relative of A.C., who had served as her foster mother. The purpose of a victim-impact statement is to allow a crime victim to provide additional information directly to the district court concerning "the harm or trauma suffered by the victim as a result of the crime" and to allow the victim to express her "reaction to the proposed sentence or disposition." Minn. Stat. § 611A.038(a)(1), (3) (2014). In light of that purpose, this court has held that a victim-impact statement may not serve as the factual basis of a sentencing departure if the record does not otherwise contain evidence to support a departure. *State v. Yanez*, 469 N.W.2d 452, 455 (Minn. App. 1991), *review denied* (Minn. June 19, 1991). For essentially the same reason, we would not allow a victim-impact statement to be the sole factual basis of an award of custody credit. Furthermore, Adams did not refer to the victim-impact statement when requesting custody credit at the sentencing hearing.

Fourth, even if we were to fully engage Adams's argument and the facts on which it is based, there are additional reasons why the argument would fail. As the state argues, the fact that a 12- to 14-year-old girl has given birth, by itself, does not necessarily mean that a crime has been committed. This appears to be true. For example, if a 12- to 14-year-old girl became pregnant by a boy who was less than 36 months older than she, there would

9

not necessarily be a crime of criminal sexual conduct. *See* Minn. Stat. §§ 609.342, subd. 1(a), (b), .343, subd. 1(a), (b), .344, subd. 1(a), (b), .345, subd. 1(a), (b).

In sum, the district court did not err by awarding Adams 436 days of jail credit based on the date on which he confessed to the crime of which he was convicted.

**Affirmed.**